Wheeling Steel Corp., Appellant, *v.* Porterfield, Tax Commr., Appellee.

(No. 41068—Decided April 24, 1968.)

86

*Mr. Carlton S. Dargusch, Jr., Mr. Roger F. Day* and *Mr. Burr A. Horn, Jr.,* for appellant.

*Mr. William B. Saxbe,* attorney general, and *Mr. Edgar L. Lindley,* for appellee.

HERBERT, J.  This appeal requires this court to determine when imported fungible goods, such as iron ore, cease to be imports under the provisions of Clause 2 of Section 10, Article I of the Constitution of the United States, which reads:

"No state shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; *and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such laws shall be subject to the revision and control of the Congress.*" (Emphasis added.)

Wheeling contends that the iron ore, *except that being used in its current operational needs,* was still an import while in storage awaiting use, and hence was not subject to taxation by the state.

The Tax Commissioner contends that all iron ore stored in the yards of Wheeling, during the audit period was no longer an import and was, therefore, subject to taxation by the state.

Section 5701.08 of the Revised Code of Ohio, in pertinent part, is as follows:

"(A) Personal property is 'used' within the meaning of 'used in business' when employed or utilized in connection with ordinary or special operations, when acquired or held as means or instruments for carrying on the business, *when kept and maintained as a part of a plant* capable of operation, whether actually in operation or not, *or when stored or kept on hand as material, parts, products, or merchandise.* Machinery and equipment classifiable upon completion as personal property while under construction or installation to become a part of a new or existing plant or other facility *is not considered to be 'used' by the owner* of such plant or other facility within the meaning of 'used in business' until such machinery and equipment is installed and in operation or capable of operation in the business *for which acquired.* * * * and merchandise or agricultural products shipped from outside of this state and held in this state in a warehouse or place of storage for storage only and for shipment outside of this state are not used in business in this state." (Emphasis added.)

Certain guidelines may be helpful in construing the foregoing constitutional and statutory provisions.

The second and third paragraphs of the syllabus in the case of *B. F. Goodrich Co.* v. *Peck*, 161 Ohio St. 202, read:

"2. Property may be held 'for storage only' even though its owner *intends at some subsequent time to sell it or use it as manufacturing material.* (*General Cigar Co., Inc.,* v. *Peck, Tax Commr.,* 159 Ohio St. 152, followed.)

"3. It is a general rule that, if there is any ambiguity in a statute defining the subjects of taxation, such ambiguity must be resolved in favor of the taxpayer; and this rule of construction generally applies with respect to provisions of a statute stating that certain potential objects of taxation shall not be considered to be included within specified subjects of taxation. * * *" (Emphasis added.)

See, also, *Pittsburgh Steel Co.* v. *Bowers*, 173 Ohio St. 74, where, at page 78 in the opinion is the following:

"A warehouse is primarily a place of storage * * *. So far as Section 5701.08, Revised Code * * * is concerned,

whether storage facilities are a building or merely a given area of ground, if they are used for storage they constitute a 'storage warehouse' within the meaning of that section.''

It is assumed that the General Assembly was familiar with the provisions and limitations fixed by Clause 2, Section 10 of Article I of the United States Constitution and did not intend to tax an import.

Coming on to consideration of the cases, it is not only appropriate but essential that we turn our attention to the able opinion delivered by Mr. Chief Justice Marshall, in *Brown* v. *Maryland* (1827), 12 Wheat. 419, 6 L. Ed. 678. At page 441 in the opinion, the learned Chief Justice said:

''* * * It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated *and mixed up with the mass of property in the country*, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; but while remaining the property of the importer, in his warehouse, in the *original form* or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the Constitution.'' (Emphasis added.)

The iron ore was in its ''original form'' and possessed of ''its distinctive character'' while in storage in Wheeling's facilities, precisely as it was when loaded on ship board in Canada and carried to Ohio on its importation journey. The only act of the importer was that of causing the iron ore to be shipped to Ohio. The ore was not ''incorporated and mixed up with the mass of property in the country,'' but remained in its ''original form'' and retained ''its distinctive character.'' Hence, under the test stated by Chief Justice Marshall, the iron ore in storage was still an import awaiting ''use'' and, therefore, immune from state taxation.

The Supreme Court of *Ohio*, in *Hooven & Allison Co.* v. *Evatt*, 142 Ohio St. 235, sustaining an assessment of state taxes, stated its view of the law in the syllabus:

''1. Where an Ohio corporation contracts to purchase fibers grown in a foreign country at a landed price at port of entry in this country, with title to remain in the seller

until goods are paid for, and such fibers are transshipped by seller's agent from port of entry to purchaser in Ohio, *such Ohio corporation is not an importer.*

"2. The state has the power to levy a general property tax on imported goods so long as such tax does not intercept the import in its way to become incorporated with the general mass of property or deny to the import the privilege of becoming so incorporated *until it shall have contributed to the revenue of the state.*" (Emphasis added.)

But the Supreme Court of the United States disagreed and reversed. In *Hooven & Allison Co.* v. *Evatt*, 324 U. S. 652, paragraphs two, five and six of the headnotes read:

"2. Since it appears on consideration of petitioner's course of business and of the circumstances attending the importation that petitioner was the inducing and efficient cause of bringing the fibers into the country, which is importation, *petitioner*, not the foreign sellers or the agents, *was the importer* of fibers brought from the Phillipine Islands and other places outside the United States, and the constitutional immunity from state taxation of the imported fibers *survived their delivery to petitioner.*

"5. The purpose of the constitutional prohibition of state taxes on imports is to protect the exclusive power of the national government to tax imports and to prevent what in matter of substance would amount to the imposition of additional import duties by states in which the property *might be found or stored before its sale or use.*

"6. The constitutional immunity of the import from state taxation was not lost by their storage (in the original packages) in warehouses at petitioners factory, pending their use in petitioner's manufacturing operations for which they were imported." (Emphasis added.)

It is now settled that the importer was The Hooven & Allison Company of Xenia, Ohio. The imported products were immune from state taxation while they were being transported to and stored in Hooven's private warehouse in Xenia, and this immunity continued *until the imports were moved from the private warehouse and put into use* in the process of manufacture in the plant of the importer. This

immunity attached, whether the imports were held in the warehouse either for *sale or for use in the manufacture* of cordage.

In *Hooven*, at page 661, in the last full paragraph of the opinion, it is said:

"\* \* \* Petitioner's contracts of purchase are the inducing and efficient cause of bringing the merchandise into the country, which is importation. Examination of the documents and consideration of the course of business can leave no doubt that the petitioner not only causes the importation but that the purpose and necessary consequence of it are to *supply petitioner with the raw material for its manufacture of cordage at its factory in Ohio.*"

If, in the above quotation, Wheeling were to be substituted for petitioner, iron ore for raw material, and steel products for cordage, the fact pattern in *Hooven* and the case at bar would be precisely the same.

Also in *Hooven*, at page 656 in the opinion of the court, it is said:

"It is obvious that if the states were left free to tax things imported after they are introduced into the country and before they are *devoted to the use for which they are imported*, the purpose of the constitutional prohibition would be defeated."

It seems just as obvious that the iron ore in huge piles in Wheeling's yards had not been, nor was it being, used for the purpose for which it was imported when the tax assessment was made. The iron ore was imported for the purpose of being used in the manufacture of steel products.

Matthias, J., in a well-reasoned opinion, speaking for a unanimous court, clearly and definitely recognized and approved the "current operational needs" rule in the case of *Continental Coffee Co.* v. *Bowers*, 174 Ohio St. 435. The second paragraph of the syllabus reads:

"Original packages of imported coffee beans which are stored by an importer-manufacturer of coffee *in amounts which are sufficient only to meet the manufacturer's current operating needs* and from which are drawn the coffee beans needed daily in its business are used in business, have lost their character as imports and are taxable under

the personal property tax laws of Ohio." (Emphasis added.)

In its practical application it may be said that the thrust of *Continental* is that a state may not impose a tax on an import until it is in actual physical use or irrevocably committed to use in the manufacture of a finished product, or as Chief Justice Marshall said in *Brown* v. *Maryland*, until it has become "incorporated and mixed up with the mass of property in the country."

The judgment in the case of *Youngstown Sheet & Tube Co.* v. *Bowers*, 166 Ohio St. 122, was affirmed by the Supreme Court of the United States (358 U. S. 534). The facts in the case at bar are readily distinguished from those in *Youngstown.*

In *Youngstown*, the evidence was submitted to the court upon an agreed *stipulation of facts.* In the case at bar, the facts were supplied by witnesses under direct and cross-examination. At page 545 in the opinion of the United States Supreme Court, it is said:

"The stipulation in the *Youngstown case* shows that the imported ores were *essential* to the operation of Youngstown's Ohio plant; that Youngstown had imported them 'for use in manufacturing' and 'to meet its estimated [manufacturing] requirements' at that plant; that the ores had arrived at their destination, had been placed in 'piles' in the 'ore yards' of that plant, and their importation journey definitely had ended; that the ores were *irrevocably committed to* 'use in manufacturing' at that plant and point of final destination; and that the daily ore needs of the plant were conveyed from the 'piles' in the 'ore yards' to 'stock bins' or 'stock houses,' holding one or two days' supply, from which they were fed into the furnaces. Does not the stipulation thus show that the ores were not only needed, imported, *and irrevocably committed* to supply, but were *actually being used to supply*, the daily requirements of the plant? * * *"

The second paragraph of the headnotes states:

"In the *Youngstown case*, a manufacturer of iron and steel imported iron ore for use in its own manufacturing process. Upon arrival at destination, these ores were

stored in 'ore yards' adjacent to the furnaces. The daily ore needs of the plant were taken from those 'ore yards' and conveyed to 'stock bins,' from which the ores were fed into the furnaces. Ohio assessed an ad valorum tax based on the average value of the ore in these 'ore yards' during the past year. Held: Since these ores were not only *needed, imported and irrevocably committed to supply, but were actually being used to supply, the daily requirements of the manufacturing plant,* they had lost their distinctive character as 'imports' and all tax immunity as such." (Emphasis added.)

In the case at bar, however, the evidence of record discloses that, by reason of seasonal weather conditions over which Wheeling had no control, it was necessary to ship a sufficient amount of iron ore during the navigational season to supply its blast furnaces, not only for the warm weather months, but also for approximately five winter months. This ore, in its original form as imported, was piled on the ground in storage facilities and was not then irrevocably committed to the use in manufacturing by Wheeling. It had been hauled inland by railroad cars and could be removed to some other location by the same means. It is reasonable to conclude that the iron ore stored in Wheeling's warehouses, unused for months, could be shipped to West Virginia facilities or other steel plants. The ore in storage retained its distinct and original identity as an import and certainly was not incorporated or mixed up with the mass of the property of the country—a test approved by Chief Justice Marshall in *Brown* v. *Maryland.*

The Supreme Court of the United States, in *Hooven, supra,* firmly establishes the "use test" when endeavoring to determine when the federal constitutional immunity from state taxation is removed from an import in this language, at page 657:

"Although one Justice dissented in *Brown* v. *Maryland, supra,* from that day to this, this court has held, without a dissenting voice, that things imported are imports entitled to the immunity conferred by the Constitution; that that immunity *survives their arrival in this country and continues until they are sold, removed from the original*

94

*package, or put to the use for which they are imported.*
*Waring* v. *The Mayor, supra,* 122-123; *Low* v. *Austin,* 13
Wall. 29, 32-33; *Cook* v. *Pennsylvania,* 97 U. S. 566, 573;
*May* v. *New Orleans,* 178 U. S. 496, 501, 507-508; *Burke* v.
*Wells,* 208 U. S. 14, 21-22, 24; *Gulf Fisheries Co.* v. *Mac
Inerney,* 276 U. S. 124, 126-127; *McGoldrick* v. *Gulf Oil
Corp.,* 309 U. S. 414, 423.''

It should be noted that the ''use test'' apparently applies to imports in bulk or in packages. This is consistent with the cornerstone case of *Brown* v. *Maryland, supra.*

It is obvious that imports may be in bulk, in packages, or in other forms. Congress has the power and the authority to levy an import tax on any form of import. If Ohio should levy a tax on a bulk import, before such import had completed its importation journey, the revenues of such tax would be for the use of the Treasury of the United States, and Congress would be empowered to take over the control and revision of such legislation.

In the case of *Orr Felt & Blanket Co.* v. *Schneider,* 3 Ohio St. 2d 14, Judge O'Neill, speaking for a unanimous court laid down this principle of law in the syllabus:

''1. When grease wool, imported for use in manufacturing upon which no duty has been paid, is stored in its original package by a manufacturing-importer in a bonded warehouse, which warehouse is under the exclusive control of the United States customs officer, such wool has not definitely ended its importation journey and has not been irrevocably committed to supply the manufacturer-importer's 'current operational needs,' and, therefore, such wool retains its constitutional immunity as an import and is not taxable under the Ohio personal property tax laws.

''2. When imported grease wool upon which duty has been paid is stored in a warehouse in inventory under the manufacturer's control for use in manufacturing, only that amount which is required to provide for the manufacturer-importer's 'current operational needs' for the length of time it takes to secure an additional supply of wool from the foreign market which the manufacturer has selected as its source of supply loses its constitutional immunity as

an import and is, therefore, taxable under the Ohio personal property tax laws."

It may now be said that the application of the "current operational needs" test, when construing Section 10, Article I of the United States Constitution, is the firmly established law of Ohio.

The amount of iron ore subject to state taxation under this test may be measured by the "length of time it takes to secure an additional supply" of iron ore "from the foreign market which the manufacturer has selected as its source of supply."

Judge O'Neill, in his opinion in *Orr Felt*, at page 23, commented:

"The test 'irrevocably committed to supply current operational needs' of the business should be applied in this case and determined upon the basis of an inventory *no larger than that required to last until a new supply can be made available.*"

*Orr Felt* cites with approval the case of *City and County of Denver* v. *Denver Publishing Co.*, 153 Colo. 539, 387 P. 2d 48, and quotes liberally from it.

In *Denver*, the publishing company purchased from foreign markets a 35-day supply of newsprint and put it in storage facilities. From time to time, as its needs required, a few days supply was taken from the storage facilities. The Supreme Court of Colorado held that the remaining newsprint in storage was not subject to state law in that it had not completed its importation journey. At page 549, the Supreme Court of Colorado, in its opinion, said:

"Denver's contention that since a 35-day supply was kept in storage by the taxpayer the entire 35-day supply must be taxable as a matter of law is also rejected. Such a contention fails to recognize the distinction between 'current operational needs' and good business practice dictated by prudent management. * * *"

In *Orr Felt*, in the opinion at page 22, it is stated:

"The lower court in the *Denver Publishing Co. case* held that since it took six days for the taxpayer to replenish

its supply of newsprint from Canada, a six-day supply was taxable as constituting current operational needs.

"The Supreme Court of Colorado approved this test for determining whether the proper standard of current operational needs had been met in the following language at page 53 [153 Colo., page 548] '* * * Viewed in this context, it is clear that *Youngstown* does not stand for the proposition that foreign goods stored for eventual use in manufacturing are automatically to be equated with goods required to be kept on hand to meet "current operational needs." The rationale is, rather, that so much of the stored imports as are required to be kept on hand to meet "current operational needs" are to be regarded as put to the use for which they were imported. Under the criteria laid down by *Brown* such goods lose their character as imports and are, therefore, subject to taxation by the states.

" 'The essential ingredient in applying *Youngstown* is a determination of "current operational needs." It is the important first step without which the ultimate legal principle cannot be utilized. It is important to note here that in *Youngstown* the court did not accept the argument of Mr. Justice Black in his *Hooven* dissent that imported goods lose their immunity as imports when "held for use" by the importer-manufacturer. The court specifically pointed out that *Youngstown* was not intended to overrule *Hooven*, but rather was in accord with it.

" 'There is no rigid and inflexible rule which can be laid down to determine the "current operational needs" of a taxpayer. This is an area wherein the policy of the law dictates *ad hoc* determinations based on the facts presented in each particular case. The trial court in the instant case held that since it took six days for the taxpayer to replenish its supply of newsprint from Canada and since the taxpayer used 60 tons of newsprint per day, that amount necessary for "current operational needs" was 360 tons and that this amount was taxable even though all the newsprint remained in the original package until actually being made ready for the presses. We approve the formula in the instant case and cannot conclude that as a matter of

law the court made an erroneous determination of the "current operational needs" of the taxpayer.' "

Although it may be argued that there are certain ambiguities in the Ohio personal property tax law, Section 5701.08 of the Revised Code, nevertheless the statute does definitely indicate that imports are immune from a state tax. The statute specifically provides that "material, parts, products, or merchandise" are taxable. "Parts" are created by some act; "products" obviously are the result of prior process; "merchandise" emanates generally from raw materials. "Material," under the doctrine of *ejusdem generis*, connotes a similar meaning to the other three words. Section 5701.08 provides further that "Products shipped from outside of this state [including imports] and held in this state in a warehouse or a place of storage 'for storage only' " are not taxable.

For reasons herein set forth, the assessment of a personal property tax upon the iron ore in question is unreasonable and unlawful.

The decision of the Board of Tax Appeals is reversed.

*Decision reversed.*

MATTHIAS, O'NEILL and BROWN, JJ., concur.

TAFT, C. J., concurs in paragraphs one, two and three of the syllabus and in the judgment.

ZIMMERMAN, J., concurs in paragraph two of the syllabus but dissents from the judgment.

SCHNEIDER, J., dissents.

TAFT, C. J., concurring. The Board of Tax Appeals held that all of the iron ore here involved was taxable. Although the majority opinion in *Youngstown Sheet & Tube Co.* v. *Bowers*, 358 U. S. 534, 3 L. Ed. 2d 490, may be susceptible of a reasonable interpretation that will support such a holding (see *Virtue Bros.* v. *Los Angeles*, 239 Cal. App. 2d 220, 48 Cal. Reptr. 505, certiorari denied 385 U. S. 820), this court unanimously concluded in *Orr Felt & Blanket Co.* v. *Schneider* (1965), 3 Ohio St. 2d 14, 209 N. E. 2d 150, that the majority opinion in the *Youngstown case*

authorized state taxation of a manufacturer's imported and stored materials only to the extent that they represented such manufacturer's "current operational needs." The record, in the instant case, clearly discloses that all of the iron ore here involved did not represent "current operational needs" of Wheeling. Hence, I concur in the judgment of reversal.

However, Judge Herbert's opinion seems to suggest that none of the iron ore here involved is subject to state taxation before it is moved from the ore piles in the storage yard to stock bins adjacent to the blast furnaces,—in other words, that Wheeling's "current operational needs" for ore include only ore after it is moved from those piles to those stock bins.

To so hold would not only give Wheeling a greater immunity from taxation of the iron ore here involved than Wheeling claims but would represent a substantial departure from the meaning that was given the term "current operational needs" by our decision in *Orr Felt & Blanket Co.* v. *Schneider, supra* (3 Ohio St. 2d 14).

In Wheeling's brief, it is stated:

"The record discloses a re-order cycle of 20 days— *i. e.*, the time required to secure an additional supply of ore from the usual foreign source including a reasonable margin for safety * * *. Wheeling claims that a twenty-day supply of the ore (based on its average *daily* consumption during the base years 1958 and 1959) constituted its current operating needs * * * and that the amount of ore in excess of its current operating needs was immune."

Certainly, our decision in *Orr Felt & Blanket Co.* v. *Schneider, supra* (3 Ohio St. 2d 14), and especially paragraph two of the syllabus, does not indicate that Wheeling should have any greater immunity than that which it is claiming.

In my opinion, the *Orr case* and the record in the instant case will not support a conclusion giving Wheeling as much as it is claiming.

For example, the statement of facts in the instant case reads in part:

"* * * the use of the Great Lakes as a waterway was

interrupted by ice formation during the winter season from approximately the 15th day of November until the forepart of the following May. * * * it was necessary to store sufficient iron ore in the storage yards of Wheeling to keep its blast furnaces in continuous operation, not only during the summer but also during the winter months. The blast furnaces were in use seven days a week.''

In Judge Herbert's opinion, it is stated:

''* * * The evidence of record discloses that, by reason of seasonal weather conditions over which Wheeling had no control, it was necessary to ship a sufficient amount of iron ore during the navigational season to supply its blast furnaces, not only for the warm weather months, but also for approximately five winter months.''

Certainly, at the end of the navigation season, at least a five-month supply of ore would then represent ''current operational needs'' of Wheeling. If it did not have that much ore on hand, it would have to shut down operations before the opening of the next navigation season.

As stated in the opinion by O'Neill, J., in *Orr Felt & Blanket Co.* v. *Schneider, supra* (3 Ohio St. 2d 14), 23:

''The test 'irrevocably committed to supply current operating needs' of the business should be applied in this case and determined upon the basis of an inventory no larger than that required to last until a new supply can be made available.''

Applying that test, at the end of the navigation season Wheeling must have an inventory sufficient ''to last until a new supply can be made available,'' that is, for at least five months.

Judge O'Neill's opinion in the *Orr case* rejects an argument somewhat similar to the one against considering inability to secure ore when navigation is closed on the Great Lakes, as increasing ''current operational needs'' of Wheeling during that period. Thus, he states, at page 24:

''This court is also of the opinion that although the evidence indicates that the taxpayer could have secured a new supply of imported grease wool from Eastern importers within 30 days, the taxpayer chose to import its own grease wool from foreign countries for the valid reasons

that it could reduce its inventory cost by six per cent to twelve per cent and insure the obtaining of a better quality and a more uniform grease wool.

"The taxpayer having made this choice, the rule applied to the taxpayer should be that that amount of grease wool removed from the bonded warehouse and in inventory which is required to meet 'current operational needs' for the length of time it takes to secure an additional supply from the foreign source which the taxpayer has selected to supply its grease wool is taxable."

I do not mean to suggest that the state may tax, as representing "current operational needs," an amount of Wheeling's stored ore equal to five months of its consumption thereof. Although the Ohio tax date is January 1, personal property, held by a manufacturer for use in manufacturing, is valued for tax purposes by taking the value of all such property owned by such manufacturer on the last business day of each month that the manufacturer was engaged in business during the year, adding the monthly values together, and dividing the result by the number of months the manufacturer was engaged in such business during the year. See Section 5711.16, Revised Code.

Thus, for example, on the last business day of the month in which the navigation season ends, the value of at least a five-month supply of Wheeling's ore should be taken, at the end of the next month only the value of a four-month supply, and so on until the beginning of the navigation season and thereafter when the value of only a 20-day supply might be taken at the end of each month. However, the admitted fact, that ore is unavailable except during the seven-month navigation season, should be considered in determining the "current operational needs" of Wheeling that are subject to state taxation.

Because the statement of facts in the instant case mentions that "prudent business practice * * * required an additional reserve of iron ore * * * in storage in order to maintain operations during potential shipping stoppages in the event of strikes or other conditions adversely affecting Wheeling's ability to meet production schedules," I believe we should recognize in the report of this case that

no one has contended that this should be considered in determining Wheeling's "current operational needs." Hence, the decision in this case should not serve as a precedent with respect to any such contention. See *State, ex rel. Gordon, v. Rhodes* (1952), 158 Ohio St. 129, 107 N. E. 2d 206 (paragraph one of the syllabus).

Brown, J., concurs in the foregoing concurring opinion except paragraphs four, five and six from the end thereof.