THE ORR FELT & BLANKET CO., APPELLEE, *v.* SCHNEIDER, TAX COMMR., APPELLANT.

[Cite as Orr Felt & Blanket Co. v. Schneider, Tax Commr., 3 Ohio St. 2d 14.]

(No. 39022—Decided June 30, 1965.)

*Messrs. Miller & Bazler* and *Mr. Frank E. Bazler,* for appellee.

*Mr. William B. Saxbe,* attorney general, *Mr. Edgar L. Lindley* and *Mr. Thomas Moyer,* for appellant.

O'NEILL, J.   Section 10, Clause 2, Article I of the United States Constitution provides:

"No state shall, without the consent of Congress, lay

18

any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws * * *.''

This is a constitutional prohibition against state taxation of imports.

The landmark case in this field is *Brown* v. *Maryland* (1827), 12 Wheat. 419, 441, 6 L. Ed. 678. That was an import-for-sale case. Chief Justice Marshall said:

''* * * when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the Constitution.''

Although that was an import-for-sale case, the court, in dicta, stated that ''* * * The same observations apply to * * * [goods] used by the importer.'', thus laying the foundation for the import-for-use doctrine which asserts that goods are protected until the importer ''has used the privilege he had purchased.'' *Brown* v. *Maryland, supra,* pages 442, 443.

Maryland had attempted to license importers. However, *Low* v. *Austin* (1871), 13 Wall. 29, 20 L. Ed. 517, extended the principle of *Brown* v. *Maryland, supra,* to cases where the state was attempting to levy its general property taxes upon imports, as in the case before us. *Low* v. *Austin, supra,* established that if the goods remain imports the states are prohibited from levying a general property tax.

*Hooven & Allison Co.* v. *Evatt, Tax Commr.* (1945), 324 U. S. 652, 89 L. Ed. 1252, 65 S. Ct. 870, was the first important case involving imports for use in manufacturing.

The taxpayer kept a large supply of imported hemp on hand from which he manufactured various products. The Tax Commissioner attempted to impose the Ohio property tax upon these hemp fibers.

The court laid down the guiding principle in these cases at page 657:

''* * * that immunity survives their arrival in this country and continues until they are sold, removed from the original

package, or *put to the use for which they were imported.*" (Emphasis added.)

Here was born the "use test." In discussing the "use test," the court said, at page 666:

"This court has pointed out on several occasions that imports for manufacture cease to be such and lose their constitutional immunity from state taxation when they are subjected to the manufacture for which they were imported * * * [citations omitted]. But no opinion of this court has ever said or intimated that imports held by the importer in the original package and before they were subjected to the manufacture for which they were imported, are liable to state taxation. * * *

"In *Brown* v. *Maryland, supra* [12 Wheat. 419], the imported merchandise held in original packages in the importer's warehouse for sale, was deemed tax immune. We do not perceive upon what grounds it can be thought that imports for manufacture lose their character as imports any sooner or more readily than imports for sale. The constitutional necessity that the immunity, if it is to be preserved at all, survive the landing of the merchandise in the United States and continue until a point is reached, capable of practical determination, when it can fairly be said that it has become a part of the mass of taxable property within a state, is the same in both cases."

The court then reserved the question which it was to later decide in the case of *Youngstown Sheet & Tube Co.* v. *Bowers, Tax Commr.* (1959), 358 U. S. 534, 3 L. Ed. 2d 490, 79 S. Ct. 383, at page 667. That question was whether "* * * the presence of [the imported goods] in the factory was so essential to current manufacturing requirements that they could be said to have entered the process of manufacture, and hence were already put to the use for which they were imported, before they were removed from the original packages."

The court in *Youngstown Sheet & Tube Co.* v. *Bowers, Tax Commr., supra,* posed the question which it had reserved in the *Hooven case, supra,* in these words, at page 543:

"Do the facts as stipulated * * * show that these manufacturers *have so acted upon the imported materials* as to cause them to lose their distinctive character as 'imports' by irrevocably committing them, after their importation journeys have

definitely ended, to 'use in manufacturing' at the plant and point of final destination * * *.''

In answering this query, at pages 545 and 546, the court stated the law as follows:

''This stipulation * * * shows that the imported ores were essential to the operation of Youngstown's Ohio plant; that Youngstown had imported them 'for use in manufacturing' and '*to meet its estimated [manufacturing] requirements*' at that plant; that the ores had arrived at their destination, had been placed in 'piles' in the 'ore yards' of that plant, and their *importation journey definitely had ended*; that the *ores were irrevocably committed to 'use in manufacture' at that plant and point of final destination*; and that the daily ore needs of the plant were conveyed from the 'piles' in the 'ore yards' to 'stock bins' or 'stock houses,' holding *one or two days' supply*, from which they were fed into the furnaces. Does not the stipulation thus show that the ores were not only needed, imported, and irrevocably committed to supply, but were *actually being used to supply the daily requirements of the plant?* It seems to us that these stipulated facts inescapably established that Youngstown had 'so acted upon the [imported ores]' (*Brown* v. *Maryland, supra* [12 Wheat.], at 441), by using them 'for the purpose for which they [were] imported,' that they must be held 'to have then entered the manufacturing process' (*Hooven & Allison Co.* v. *Evatt, supra* [324 U. S.] at 665, 667) and to have lost their distinctive character as 'imports' and all tax immunity as such.'' (Emphasis added.)

The rule was thus established that when goods imported for use in manufacturing have definitely ended their importation journey and have been irrevocably committed to supply the manufacturer's current operational needs, such goods have lost their constitutional immunity as imports.

This court followed that rule in *Continental Coffee Co.* v. *Bowers, Tax Commr.* (1963), 174 Ohio St. 435. Paragraph two of the syllabus reads:

''Original packages of imported coffee beans which are stored by an importer-manufacturer of coffee *in amounts which are sufficient only to meet the manufacturer's current operating needs* and from which are drawn the coffee beans needed daily in its business are used in business, have lost

their character as imports and are taxable under the personal property tax laws of Ohio." (Emphasis added.)

Neither the *Youngstown case* nor the *Continental case* decided the question presented by the case before this court.

In the *Continental case* all the coffee and in the *Youngstown case* all the ore were necessary and irrevocably committed to meet the taxpayers' current operational needs.

Here the question is, how much of the imported wool on hand is necessary to meet the taxpayer's current operational needs?

The Board of Tax Appeals asserted its position in the following language:

"We reject appellant's contention that since it could be operating successfully with only a thirty day supply of imported wool on hand, only a thirty day supply of imported wool constitutes its current operational needs. We find that the imported wool, once it was removed from bond, became *immediately available for use* and became a part of appellant's total inventory *immediately available for current operational needs* and, therefore, subject to state taxation." (Emphasis added.)

The Board of Tax Appeals is in error in this reasoning which would establish an "immediately available" standard no different from a "held for use" standard, both of which are unconstitutional standards under the *Hooven & Allison Co. case* decision.

The Board of Tax Appeals misapplied the *Continental Coffee case*. In that case, there was only a three-week supply of imported coffee in the warehouse and it was properly held subject to the tax. The court was not called upon *to determine what were the current operational requirements of the importer* in the *Continental Coffee case* as is required in this case.

The proper standard to be applied in this case is *"current operational needs."*

The only case in which this question, What are the *"current operational needs"* of a manufacturer?, has been squarely faced and answered is *City and County of Denver* v. *Denver Publishing Co.* (Colo. 1963), 387 P. 2d 48. The taxpayer in that case was a newspaper which imported newsprint from Canada. A 35-day supply of newsprint was kept on hand.

The Supreme Court of Colorado stated, at page 53:

"Denver's contention that since a 35 day supply was kept in storage by the taxpayer the entire 35 day supply must be taxable as a matter of law is also rejected. Such a contention fails to recognize the distinction between 'current operational needs' and good business practice dictated by prudent management. * * *"

The lower court in the *Denver Publishing Co.* case held that since it took six days for the taxpayer to replenish its supply of newsprint from Canada, a six-day supply was taxable as constituting current operational needs.

The Supreme Court of Colorado approved this test for determining whether the proper standard of current operational needs had been met in the following language, at page 53:

"* * * Viewed in this context, it is clear that *Youngstown* does not stand for the proposition that foreign goods stored for eventual use in manufacturing are automatically to be equated with goods required to be kept on hand to meet 'current operational needs.' The rationale is, rather, that so much of stored imports as are required to be kept on hand to meet 'current operational needs' are to be regarded as put to the use for which they were imported. Under the criteria laid down by *Brown* such goods lose their character as imports and are, therefore, subject to taxation by the states.

"The essential ingredient in applying *Youngstown* is a determination of 'current operational needs.' It is the important first step without which the ultimate legal principle cannot be utilized. It is important to note here that in *Youngstown* the court did not accept the argument of Mr. Justice Black in his *Hooven* dissent that imported goods lose their immunity as imports when 'held for use' by the importer-manufacturer. The court specifically pointed out that *Youngstown* was not intended to overrule *Hooven*, but rather was in accord with it.

"There is no rigid and inflexible rule which can be laid down to determine the 'current operational needs' of a taxpayer. This is an area wherein the policy of the law dictates *ad hoc* determinations based on the facts presented in each particular case. The trial court in the instant case held that since

it took six days for the taxpayer to replenish its supply of newsprint from Canada and since the taxpayer used 60 tons of newsprint per day, that amount necessary for 'current operational needs' was 360 tons and that this amount was taxable even though all the newsprint remained in its original package until actually being made ready for the presses. We approve the formula in the instant case and cannot conclude that as a matter of law the court made an erroneous determination of the 'current operational needs' of the taxpayer."

The test "irrevocably committed to supply current operating needs" of the business should be applied in this case and determined upon the basis of an inventory no larger than that required to last until a new supply can be made available.

This is a realistic, practical and rational rule and the facts upon which it is based are easily and accurately obtainable from the records of the taxpayer.

If more of the imported goods are available than would be used before the time needed to secure a new supply would elapse, this amount is excess and is not "irrevocably committed to use in manufacturing."

In this case, the taxpayer attempts to bring itself within the rule set forth in the *Denver Publishing Co.* case by asserting that wool could have been obtained from East coast importers within 30 days, thus contending that only an average 30-day supply of such imported grease wool is necessary for "current operational needs" (or the current manufacturing requirements). The taxpayer's position is that all of the imported grease wool stored by the taxpayer in its unbroken original containers within its bonded warehouse is immune from taxation by the state of Ohio, and all of the imported grease wool stored by the taxpayer outside of its bonded customs warehouse, except for this average 30-day supply, is immune from taxation by the state of Ohio under the provisions of Section 10, Clause 2, Article I of the Constitution of the United States.

This court is of the opinion that with regard to the grease wool in the bonded customs warehouse of the taxpayer, *all phases of the importation journey had not ended,* as required to make an import subject to taxation by the prin-

ciples stated in the *Youngstown Sheet & Tube Co.* case, and in *United States Plywood Corp.* v. *City of Algoma,* 2 Wis. 2d 567, 87 N. W. 2d 481, affirmed, 358 U. S. 534.

This wool in the bonded customs warehouse is, therefore, immune from taxation.

This court is also of the opinion that although the evidence indicates that the taxpayer could have secured a new supply of imported grease wool from eastern importers within 30 days, the taxpayer chose to import its own grease wool from foreign countries for the valid reasons that it could reduce its inventory cost by six to twelve per cent and insure the obtaining of a better quality and a more uniform grease wool.

The taxpayer having made this choice, the rule applied to the taxpayer should be that that amount of grease wool removed from the bonded warehouse and in inventory which is required to meet "current operational needs" for the length of time it takes to secure an additional supply from the foreign source which the taxpayer has selected to supply its grease wool is taxable. The remainder of the inventory not in the bonded customs warehouse is immune from the imposition of the state property tax.

That portion of the decision of the Board of Tax Appeals relating to the wool in the bonded customs warehouse is affirmed and that portion of the decision relating to the wool which had been removed from the bonded customs warehouse is reversed and remanded to the Board of Tax Appeals for a redetermination in accordance with this opinion.

The decision of the Board of Tax Appeals is affirmed in part and is reversed and remanded in part.

*Judgment accordingly.*

TAFT, C. J., ZIMMERMAN, MATTHIAS, HERBERT, WASSERMAN and BROWN, JJ., concur.

WASSERMAN, J., of the Eighth Appellate District, sitting for SCHNEIDER, J.