PRODUCTION STEEL STRIP CORPORATION v CITY OF DETROIT

OPINION OF THE COURT

1. CONSTITUTIONAL LAW—UNITED STATES CONSTITUTION—CONSTRUCTION.

An analysis of controlling United States Supreme Court decisions is essential where a case of first impression before the Michigan Supreme Court involves the interpretation of the United States Constitution.

2. COMMERCE—CONSTITUTIONAL LAW—IMPORTS—STATES—CURRENT OPERATIONAL NEEDS.

The United States Supreme Court grants the states a reasonable amount of latitude in determining what "current operational needs" are once it is clear that the manufacturers *have so acted upon the imported materials* as to lose their distinctive character as imports.

3. COMMERCE—IMPORTS—STATES—CURRENT OPERATIONAL NEEDS.

Once the importer has irrevocably committed imports at their journey's end to use in manufacturing, the states have a reasonable amount of latitude in determining "current operational needs".

4. COMMERCE—IMPORTS—TAXATION—CONSTITUTIONAL LAW.

Defendant taxing authorities were quite within their authority in assessing plaintiff's imported steel coils on hand on the tax date, December 31 of each year, on a formula of 2-1/2 months usage where a substantial portion of plaintiff's needs for steel coils was obtained from foreign mills and was delivered on an average of 2-1/2 months lead time after same was ordered.

5. COMMERCE—IMPORTS—TAXATION—APPEAL AND ERROR.

Insofar as *Knight Newspapers, Inc v Detroit,* 16 Mich App 438

REFERENCES FOR POINTS IN HEADNOTES

[1] 20 Am Jur 2d, Courts §§ 186, 197.
[2, 3] 15 Am Jur 2d, Commerce §§ 5, 6, 66.
[4–10] 15 Am Jur 2d, Commerce §§ 11, 21.
[11] 5 Am Jur 2d, Appeal and Error § 825.

(1969) adopts "[t]he rule and formula used in "*Denver v Denver Publishing Co,* 153 Colo 539 (1963), which was that once imported goods become part of the "current operational needs" of a business, they lose their constitutional immunity to local taxation and "current operational needs" are determined by multiplying the number of days needed to replenish the business's stock by the average quantity of goods which is used daily, as the rule in Michigan it is disapproved and overruled.

## CONCURRING OPINION

T. G. KAVANAGH, LEVIN, and M. S. COLEMAN, JJ.

6. COMMERCE—STATES—TAXATION—IMPORTS—CONSTITUTIONAL LAW—ORIGINAL PACKAGE.

*Immunity from state taxation of imports under the United States Constitution survives their arrival in this country and continues until they are sold, removed from the original package, or put to the use for which they are imported.*

7. COMMERCE—STATES—IMPORTS—MANUFACTURING—TAXATION.

*Commodities imported for use in manufacturing, like commodities imported for other uses, retain their immunity from state taxation beyond their importation until they are used by the importer or put to the use for which they are imported.*

8. COMMERCE—IMPORTS—MANUFACTURING—REPLENISHMENT TIME TEST.

*The replenishment time test, for determining when goods imported for manufacture are used for the purpose for which they are imported, is a two-factor test: (1) time required to obtain additional supplies of the commodity, and (2) quantity used during that period.*

9. COMMERCE—IMPORTS—CURRENT OPERATIONAL NEEDS.

*"Current operational needs" does not seek to measure the importer-manufacturer's need for domestic supplies but rather the quantities of foreign supplies required to maintain the segment of his manufacturing operations he chooses to stoke with foreign supplies.*

10. COMMERCE—IMPORTS—STATES—TAXATION.

*The portion of plaintiff's December 31 inventory of foreign steel subject to state taxation is the amount needed to cover plaintiff's actual usage of foreign steel in the 2-1/2 months agreed-upon time required to obtain new supplies of foreign steel.*

11. APPEAL AND ERROR—STIPULATED FACTS—STIPULATED ISSUES.

*Case should be disposed of on the stipulated facts and issues which able counsel on both sides framed.*

Appeal from Court of Appeals, Division 1, Holbrook, P. J., and T. M. Burns and Danhof, JJ., affirming Wayne, Neal Fitzgerald, J. Submitted June 6, 1973. (No. 8 June Term 1973, Docket No. 54,428.) Decided December 18, 1973.

42 Mich App 698 reversed.

Complaint by Production Steel Strip Corporation against the City of Detroit, the Board of Education of the City of Detroit, Wayne County, the Treasurer of the City of Detroit, and the Treasurer of Wayne County for refund of a portion of personal property taxes. Judgment for plaintiff. Defendants appealed to the Court of Appeals. Affirmed. Defendants appeal. Reversed and remanded to circuit court for further proceedings.

*Shapero, Shapero & Cohn,* for plaintiff.

*Michael M. Glusac,* Corporation Counsel, and *Lawrence W. Morgan* and *Arthur Yim,* Assistants Corporation Counsel, for defendants City of Detroit and its City Treasurer.

*Aloysius J. Suchy,* Corporation Counsel, and *William F. Koney,* Assistants Corporation Counsel, for defendants County of Wayne and its County Treasurer.

*Ostrowski, Wilson, Belanger & Bowman, P. C.,* for defendant Board of Education of the City of Detroit.

WILLIAMS, J. The principal question presented

by this case is whether and to what extent plaintiff Production Steel Strip Corporation has so acted upon the materials which it has imported for use in its manufacturing operations as to cause them to lose their distinctive character as imports and their immunity from property taxation within the meaning of "imports" as used in the Import-Export Clause, Art I, § 10, cl 2 of the United States Constitution.[1]

## I—FACTS

Stipulated facts as pertinent are:

"Plaintiff, Production Steel Strip Corporation's business is in part (1) to purchase hot roll steel coils and by descaling, cold reducing, annealing and skin rolling, to produce cold roll strip of restricted tolerances and specialized steel finishes, * * * .

"The hot roll steel coils purchased by Taxpayer are a standard product. Such product when imported from foreign mills is identical with, interchangeable with, and cannot be differentiated so far as utility is concerned from steel acquired from domestic mills. Such steel coils are produced to the same specifications and have the same properties.

"Plaintiff purchased its steel coils from domestic mills and from foreign mills. During the Great Lakes navigation season (April 1 of each year to November of such year), a substantial portion of its needs for steel coils in 1965, 1966 and 1967 was obtained from foreign mills and was delivered to Taxpayer at Detroit on an average of a two and one-half months lead time after same was ordered. A substantial portion of such imports were, on December 31, 1965, stored outside of the boat dock, not under customs warehouse bond, some was stored in

---

[1] Article I, § 10, cl 2 of the United States Constitution provides in pertinent part:

"No State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws * * * ."

Taxpayer's warehouse on Humboldt Street near the dock, and small amounts were on tax date stored at other warehouses. Such imported steel is transported to Taxpayer's plant at 20001 Sherwood, fourteen (14) miles from the dock, when there is room at Taxpayer's plant on Sherwood. On tax date Production Steel Strip, Inc. had sufficient steel coils at its plant on Sherwood for its needs for about two months.

"After the close of navigation season between November of 1965 and April 1, 1966 and between November 1966 and April 1, 1967, Taxpayer purchased its supply of steel coils from domestic mills only and not from foreign mills. The time elapsing from date of Order to date of Delivery of such purchases from domestic mills during such periods between November 1965 and April 1, 1966 and between November 1966 and April 1967 was one-half month."

Defendants are the local governmental authorities who annually assess, levy and collect personal property taxes on such property as is within their corporate limits on the tax date, December 31 of each year. The assessments in question are for the tax years 1966 and 1967. The following facts are not stipulated but are of record as indicated.

The 1966 assessment, made on the basis of property on hand December 31, 1965, was made by both the local Board of Assessors and the State Tax Commission on the basis "that a 2 1/2 month usage was 'essential to current requirements.' " (In re Appeal No. 1155 of Production Steel Strip Corporation, 1967, Michigan State Tax Commission, paragraph 5; and see complaint, paragraph 6, answer, paragraph 6.) The State Tax Commission stated:

"2. That the city of Detroit has stated that the appellant is the importer of the steel inventories in question but because of the action of taxpayer in processing this steel a portion of the inventory of steel

should nevertheless be added to its assessment, representing that part,

" ' . . . essential to current manufacturing requirements . . . ' Youngstown Sheet & Tube Co. vs Bowers, 358 US 534, 79 S Ct 383 [3 L Ed 2d 490 (1959)]."

The 1967 assessment was more complicated. The Board of Assessors assessed on the basis that, and the State Tax Commission affirmed that the amount of imported inventory that had lost its constitutional immunity and was taxable "was the entire amount of such imports and was not limited to two and one-half (2-1/2) months processing and shipment." (Complaint, ¶ 6; answer, ¶ 6, *Production Steel Strip Corp v City of Detroit,* No 121450; In re Appeal No 1377 of Production Steel Strip Corp, 1968, Michigan State Tax Commission.) The State Tax Commission noted:

"The Commission is in accord with the city of Detroit in relying on the recent court decision of *Virtue Bros. vs County of Los Angeles,* [239 Cal App 2d 220] 43 Cal. Reporter 505 [1966], with certiorari denied by the United States Supreme Court on October 10, 1966."

While the Board of Assessors and State Tax Commission originally adopted the formula of taxing all the imported steel present on December 31, 1966, on appeal to the circuit court, prior to final judgment, the defendants abandoned this position, principally on the basis of the Court of Appeals case of *Knight Newspapers, Inc v Detroit,* 16 Mich App 438; 168 NW2d 318 (1969). The defendants resumed their 1966 assessment position "that a 2 1/2 months usage was 'essential to current requirements.' " Plaintiff, of course, continued to argue for a 1/2 month basis. (Affidavit in support

of motion for partial summary judgments, September 1, 1970, No 121450, *supra.)*[2]

The circuit court relying on *Denver v Denver Publishing Co,* 153 Colo 539; 387 P2d 48 (1963); *Orr Felt & Blanket Co v Schneider,* 3 Ohio 2d 14; 209 NE2d 150 (1965) and *Knight Newspapers, Inc v Detroit,* 16 Mich App 438 (1969) accepted plaintiff's 1/2 month replenishment from domestic sources formula.

Defendant taxing authorities appealed this judgment to the Court of Appeals. The Court of Appeals with a divided Court affirmed holding that 14 days was the correct replenishment time to be used in computing the taxpayer's current operational needs. 42 Mich App 698, 703; 202 NW2d 719. The minority opinion stated:

"We are here considering the taxable status of the plaintiff's foreign inventory, and I cannot see why the fact that the plaintiff satisfies some of his needs domestically should make any difference." 42 Mich App 698, 705.

We granted leave to appeal. 388 Mich 808 (1972).

## II—STATE TAXATION OF IMPORTS— UNITED STATES SUPREME COURT ANALYSIS OF ART I, § 10, CL 2

As this is a case involving the interpretation of the United States Constitution and a case of first impression before this Court, an analysis of controlling United States Supreme Court decisions is essential.

In any historical analysis of the decisions relat-

---

[2] Not a part of the facts of this case but of interest, for the 1969 assessment, the State Tax Commission used a three months figure as "essential to current requirements." (In re Appeal No 1515 of Production Steel Strip Corporation, 1970).

ing to state taxation of imports from a foreign country, we must begin with the opinion of Chief Justice Marshall in *Brown v Maryland,* 25 US (12 Wheat) 419; 6 L Ed 678 (1827), the landmark case dealing with art I, § 10, cl 2 of the United States Constitution. *Brown* was concerned with a Maryland statute declaring that importers of foreign goods by the bale or package must secure a license in order to sell their goods. The Court held that the statute levied a prohibited impost on imports and was, therefore, unconstitutional and in the course of the opinion Chief Justice Marshall stated that "there must be a point of time when the prohibition ceases, and the power of the State to tax commences." Having stated the premise, he elaborated on the vexatious nature of it:

"The constitutional prohibition on the States to lay a duty on imports, a prohibition which a vast majority of them must feel an interest in preserving, may certainly come in conflict with their acknowledged power to tax persons and property within their territory. The power, and the restriction on it, though quite distinguishable when they do not approach each other, may yet, like the intervening colours between white and black, approach so nearly as to perplex the understanding, as colours perplex the vision in marking the distinction between them. Yet the distinction exists, and must be marked as the cases arise. Till they do arise, it might be premature to state any rule as being universal in its application. It is sufficient for the present to say, generally, that *when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import,* and has become subject to the taxing power of the State; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in

the constitution." (Emphasis added.) 25 US (12 Wheat) 419, 439.

Chief Justice Marshall also elaborated on some acts or conduct of the importer which would cause the goods to be "mixed up with the mass of property in the county [and to lose] its distinctive character as an import". He held that the goods lose their character as imports when the importer (1) "sells them," or (2) "[breaks] up his packages, and [travels] with them as an itinerant pedlar," or (3) that the goods brought into this country by an importer "for his own use" and here "used" by him are to be regarded as a part of "the common mass" of property and are not immune from state taxation. 12 Wheat 419, 443.

Thus, Marshall's discourse went beyond the scope of the question actually presented in *Brown,* but the United States Supreme Court subsequently applied the principle that imported goods themselves cannot be taxed by the states while held in the importer's warehouse in the original package for resale. See *Low v Austin,* 80 US (13 Wall) 29; 20 L Ed 517 (1871); *License Cases,* 46 US (5 How) 504; 12 L Ed 256 (1847).

The United States Supreme Court has recognized, as had Chief Justice Marshall, that the point comes when an import loses its constitutional immunity by ceasing to be an import. They have stated that immunity is lost when:

(1) the original package is broken;[3]

(2) the goods are sold;[4]

---

[3] *Cook v Pennsylvania,* 97 US 566; 24 L Ed 1015 (1878); *May & Co v New Orleans,* 178 US 496; 20 S Ct 976; 44 L Ed 1165 (1900).

[4] *Waring v The Mayor,* 75 US (8 Wall) 110; 19 L Ed 342 (1869) (the initial importer had entered into a contract of sale prior to the landing of the goods, but, since under the contract he was responsible for any loss or damage, his vendee was held not to take his place as importer). *License Cases, supra,* 575; *Low v Austin, supra, May & Co v New Orleans, supra.*

(3) the character of the goods imported is changed by subjecting them to a manufacturing process;[5]
(4) by making use of the goods.[6]

In *Hooven & Allison Co v Evatt,* 324 US 652; 65 S Ct 870; 89 L Ed 1252 (1945)[7] the Supreme Court considered the validity of an Ohio ad valorem tax levied on imported bales of hemp and other fibers which were stored in the manufacturer's warehouse in their original packages prior to their use in the manufacture of cordage and similar products. The Ohio Supreme Court had held the tax valid on the ground that imports for use, as opposed to imports for sale, lost their constitutional immunity upon storage in their original packages because they had become intermingled with the common mass of property within the state. The United States Supreme Court held that the tax violated the Import-Export Clause. The Court held that the mere storage of hemp anticipatory to its being placed in the manufacturing process did not itself constitute a "putting to use" and thus held the tax upon hemp invalid. Justice Stone, speaking for a majority of the Court, stated:

"It cannot be said that the fibers were subjected to manufacture when they were placed in petitioner's warehouse in their original packages. And it is unnecessary to decide whether, for purposes of the constitutional immunity, the presence of some fibers in the

[5] *Gulf Fisheries Co v MacInerney,* 276 US 124; 48 S Ct 227; 72 L Ed 495 (1928) (imported raw fish processed prior to the imposition of the tax). But see *Low v Austin, supra* (imported champagne not subject to taxation while in the possession of the importer although during such time it was aging).

[6] *Southern Pacific Co v Calexico,* 288 F 634 (SD Cal, 1923) (imported goods pledged to secure a loan held to be taxable because put to use). *See also Brown v Maryland,* 25 US (12 Wheat) 419, 443 (1827) (dictum) (referring to plate or furniture used by the importer).

[7] See the note on this case by Thomas Reed Powell, *State Taxation of Imports—When Does an Import Cease to be an Import* in 58 Harv L Rev 858 (1945).

factory was so essential to current manufacturing requirements that they could be said to have entered the process of manufacture, and hence were already put to use for which they were imported, before they were removed from the original packages. *Even though the inventory of raw material required to be kept on hand to meet the current operational needs of a manufacturing business could be thought to have then entered the manufacturing process, the decision of the Ohio Supreme Court did not rest on that ground, and the record affords no basis for saying that any part of petitioner's fibers, stored in its warehouse, were required to meet such immediate current needs.* Hence we have no occasion to consider that question." 324 US 652, 667. (Emphasis added.)

Thus, the *Hooven* Court specifically stated that it left open the question as to whether the presence of some fibers in the factory were so essential to "current manufacturing requirements" that they could be said to have entered the process of manufacture and hence had already been "put to the use" for which they were imported.

That precise question was faced by the United States Supreme Court in the companion cases of *Youngstown Sheet & Tube Co v Bowers* and *(United States Plywood Corp v Algoma),* 358 US 534; 79 S Ct 383; 3 L Ed 2d 490 (1959).[8]

The question posited by the *Youngstown* Court also was the basis of their new standard. The Court asked:

"*Do the facts as stipulated and found in the cases before us,* when considered in the light of applicable legal principles, show that these manufacturers *have so acted upon the imported materials as to cause them to lose their distinctive character as 'imports' by irrevocably committing them, after their importation journeys*

---

[8] For a discussion of the *Youngstown* case see 73 Harv L Rev 84, 176–179 (1959); 34 Notre Dame Law 593, 594–596 (1959); 1959 Wis L Rev 330, 335–336 (1959).

*have definitely ended, to 'use in manufacturing' at the
plant and point of final destination, and by 'entering'
and 'using' them 'in manufacturing' at that place?"* 358
US 534, 543. (Emphasis added.)

In the *Youngstown* case, 166 Ohio St 122; 140
NE2d 313 (1957) (which involved ores shipped in
bulk), the Ohio Supreme Court upheld an ad valo-
rem tax on imported iron ores (used in the process
of manufacturing iron and steel) which were
stored in "ore yards" in storage piles according to
country of origin and grade adjacent to the manu-
facturing facilities of the importer. A portion of
the foreign ores was periodically removed from
these "ore yards" to "stock bins" or "stock houses"
located close to the furnaces. These "stock bins"
held a one or two day's supply and were the source
from which the furnaces were fed ores. This repeti-
tive removal to the "stock bins" gradually depleted
the stock piles of ores in the "ore yards" which in
turn were replenished by new imports of bulk iron
ores from foreign sources. This resulted in a com-
mingling of old and new shipments of iron ores in
the "ore yards". The Supreme Court of Ohio held
that the:

"[P]rotection [of the Import-Export Clause] cannot
extend to such iron ore (1) after it has been commingled
with other iron ore imported at a different time, even
though such iron ore is of the same grade and was
imported from the same place, and (2) after portions of
such ore have been removed for use in manufacturing."
166 Ohio St 122; 140 NE2d 313, 314–315.

Similarly, in the *United States Plywood Corpo-
ration* case, 2 Wis 2d 567; 87 NW2d 481 (1958), the
Wisconsin Supreme Court held that raw materials
imported from foreign countries and stored at the
importer's factory in their original packages are

not immune from a general property tax when such goods are "put to the use for which acquired" in the sense of being essential to the current manufacturing requirements of the importer. The goods involved in this case were imported lumber and veneers. The lumber imported in bulk was unloaded from railroad cars and stacked in piles adjacent to the importer's plant to air dry. Since most of the lumber was imported in a "green" condition, it had to be dried before it could be used for manufacturing purposes. This air-drying was a preliminary step to a subsequent kiln drying operation. The Wisconsin Supreme Court readily found that the dominant purpose of the stacking was to air dry the lumber so that it had "entered the process of manufacture" and was thus "put to the use for which [it was] imported." The City of Algoma imposed a property tax on one-half of the lumber and veneer on the ground that that portion was committed for immediate use in manufacturing. The Wisconsin Supreme Court upheld the tax on the same ground. This finding, not contested on appeal, was affirmed by the United States Supreme Court.

The veneers in the *Plywood* case were imported in bundles secured by metal straps or in wooden crates and kept in such packages in the importer's warehouse until used in the manufacturing process. The Wisconsin Supreme Court approved the lower court's findings that one-half of the amount of the veneers on hand was necessary to meet the importer's current operational needs and therefore had lost constitutional immunity since the veneers were "in substance being put to the use for which the raw materials were imported, even though not yet removed from their wrappings or subjected to any physical or chemical change." The United

States Supreme Court affirmed this holding using as its principal authorities *Brown v Maryland* and *Hooven & Allison Co v Evatt.*

Perhaps of particular significance in this case because of the opinions and arguments below and on appeal are the formulas used in *Youngstown* and *United States Plywood* by Ohio and by Wisconsin. There is nothing in either the report of *Youngstown* in the Ohio Supreme Court or in the United States Supreme Court to indicate that Ohio did not tax the entire amount of imported ore present on tax day. The only clue to the amount of ore then present is that "Youngstown endeavors to maintain 'a supply of imported ores to meet its estimated requirements for a period of at least three months.'" 358 US 534, 537. In *United States Plywood,* "[t]he Assessor of the City of Algoma, believing that one-half of the lumber and veneers on hand on the taxing date was necessarily required to be kept on hand to meet the current operating needs of petitioner's manufacturing plant, assessed an ad valorem tax upon the value of that one-half of the lumber and veneers." 358 US 534, 547.

Quite simply in *Youngstown* it appears that the assessor assessed all the imports that were there, which probably was in the neighborhood of a three months supply. In *United States Plywood,* the assessor judged half of what was on hand was necessary for "current operating" needs.

There is no mention and no evidence of interest in *Youngstown* in the specifics of daily or monthly usage or of replenishment time which have figured so largely in the arguments and opinions in the instant case.

Without any such evidence, the United States Supreme Court concluded:

*"[T]he facts as stipulated and found in the cases
before us,* when considered in the light of applicable
legal principles, show that these manufacturers *have so
acted upon the imported materials as to cause them to
lose their distinctive character as 'imports' by irrevoca-
bly committing them, after their importation journeys
have definitely ended, to 'use in manufacturing' at the
plant and point of final destination, and by 'entering'
and 'using' them 'in manufacturing'* at that place [.]"
358 US 534, 543. (Emphasis added.)

The United States Supreme Court deals with the
"current operational needs" test of *Hooven* as
follows:

"Unlike *Hooven,* these are not cases of the mere
storage in a warehouse of imported materials intended
for eventual use in manufacturing but not found to
have been, essential to current operational needs. *Here
the Ohio and Wisconsin courts have in effect held that
the stipulated and found facts show that the imported
materials that were taxed by those States were so
essential to current manufacturing requirements that
they must be said to have entered the process of manu-
facture,* and those courts have rested their judgments,
in major part at least, on that ground. Our question
therefore is precisely the one which the Court did not
reach or consider in the *Hooven* case." 358 US 534, 544.
(Emphasis added.)

A fair conclusion to be drawn from *Youngstown*
is that the United States Supreme Court grants
the states a reasonable amount of latitude in
determining what "current operational needs" are[9]
once it is clear that the "manufacturers *have so
acted upon the imported materials* as to lose their
distinctive character as 'imports' ". 358 US 534,
543. (Emphasis added.)

We turn now to determining whether and to

---

[9] Same conclusion reached, *In re Asheville Citizen-Times Publishing
Co,* 281 NC 210, 220; 188 SE2d 310, 316 (1972).

what extent the hot roll steel coils in the instant case had lost "their distinctive character as 'imports' " under the standards established in *Youngstown.*

## III—*YOUNGSTOWN & PRODUCTION STEEL*

We begin a comparative analysis of *Youngstown* and *Production Steel* with a transitional quotation from *Youngstown:*

"And inasmuch as 'the reconciliation of the competing demands of the constitutional immunity and of the state's power to tax, is an extremely practical matter' *(Hooven & Allison Co. v. Evatt, supra,* at 668), we must approach the question whether these materials had been 'put to the use for which they [were] imported' *(id.,* at 657) with full awareness of realities and treat with them in a practical way." 358 US 534, 545.

Following the above quotation the United States Supreme Court finds that "the ores were not only needed, imported, * * * irrevocably committed to supply * * * [and] entered the manufacturing process * * * and to have lost their distinctive character as 'imports' and all tax immunity as such" (358 US 534, 546) from the following facts:

"The stipulation in the *Youngstown* case shows that the imported ores were essential to the operation of Youngstown's Ohio plant; that Youngstown had imported them 'for use in manufacturing' and 'to meet its estimated [manufacturing] requirements' at that plant; that the ores had arrived at their destination, had been placed in 'piles' in the 'ore yards' of that plant, and their importation journey definitely had ended; that the ores were irrevocably committed to 'use in manufacturing' at that plant and point of final destination; and that the daily ore needs of the plant were conveyed from the 'piles' in the 'ore yards' to 'stock bins' or 'stock

houses,' holding one or two days' supply, from which they were fed into the furnaces." 358 US 534, 545–546.

In *Production Steel,* there is no question but that "the imported [steel coils] were essential to the operation" of plaintiff's plant, that the steel coils in issue were imported "for use in manufacturing" and "to meet estimated requirements"; and that the steel coils' "importation journey definitely had ended" and were "irrevocably committed to 'use in manufacturing at that plant and point of final destination.'" No question at all about this.

The service of supply in *Production Steel* does not consist of "'piles' in the 'ore yards' to 'stock bins'" exactly. But the flow of material from boat docks and surrounding warehouses to the factory curtilage and into the factory itself is certainly the same kind of manufacturing materials feeding process with which almost everyone in Michigan is generally familiar. So the supply line in *Production Steel* is strictly comparable to *Youngstown.*

The aforementioned comparative analysis brings *Production Steel* within the *Youngstown* rule relative to losing the "distinctive character of imports", etc.

What about *Hooven's* "current operational needs"?

This is a point we considered specifically above and concluded that once the importer has irrevocably committed imports at their journey's end to use in manufacturing, the states have a reasonable amount of latitude in determining "current operational needs".

The fact of the matter appears to be that the Board of Assessors and the State Tax Commission have not been entirely sure what the legal guidelines should be in determining "current opera-

tional needs". They have employed at least two formulas, the first assessing all imports present on the taxing date, the second assessing of the imports present on the taxing date the equivalent of daily requirements multiplied by the number of days needed to replenish such requirements from the foreign source derived.

There may be justification for the first formula in *Youngstown* and the California case, for which the United States Supreme Court denied certiorari, which upheld assessing all imported property present on the taxing date. *(Virtue Bros v Los Angeles County,* 239 Cal App 2d 220; 48 Cal Rptr 505 [1966], *cert den,* 385 US 820; 87 S Ct 45; 17 L Ed 2d 58 [1966].)[10]

However, since defendants have receded from that position and since that matter was not argued before us, we leave the question open and express no opinion.

As to the second assessment formula that the "current operational requirements" are 2-1/2 months usage with a patent or latent reference to the replenishment time from abroad, certainly there is nothing in *Youngstown* that precludes approving this formula. As a matter of fact, Production Steel's 2-1/2 months usage compares favorably with Youngstown's attempted maintenance of 3 months requirements, and, of course, we have no comparable standard from *United States Plywood.*

If we look to the facts further we find that on the taxing date plaintiff had about nine months usage on hand (derived from Exhibit V, Stipulation of Facts). Recognizing the facts of life of Great Lakes shipping, this would suggest that plaintiff

---

[10] *See also American Smelting & Refining Co v Contra Costa County,* 271 Cal App 2d 437; 77 Cal Rptr 570 (1969); *In re Asheville Citizen-Times Publishing Co,* 281 NC 210; 188 SE2d 310 (1972).

had established a manufacturing service of supply sufficient to meet its operational requirements until the reopening of navigation.[11] Since plaintiff freely admitted the cost advantage of such imports, it would appear that plaintiff had prudently established a manufacturing supply line to meet its operational needs which would advantage it most.

In the face of such a general fact situation, it certainly cannot be said that defendants' judgment as to "current operational requirements" was excessive whatever theoretical argument might be made that replenishment of usage was possible in 1/2 month.[12] As *Youngstown* held "we must approach the question whether these materials had been 'put to the use for which they [were] imported' *[Hooven,* p 657] with full awareness of realities and treat them in a practical way." 358 US 534, 545.

We therefore mindful of the injunction in *Youngstown* (358 US 534, 550) not to "impute to Framers of the Constitution a purpose to make such a discrimination in favor of materials imported from other countries as would result if we approved the views pressed on us by the manufacturers" hold that defendants were quite within their authority in assessing plaintiff's imported steel coils on a formula of 2-1/2 months usage.

## IV—*KNIGHT* AND *DENVER*

The courts below, the State Tax Commission and

---

[11] *See* comments of Chief Justice Taft in *Wheeling Steel Corp v Porterfield,* 14 Ohio St 2d 85, 100; 236 NE2d 652, 661 (1968) on the impact of Great Lakes shipping on "current operational needs." The Ohio Supreme Court reversed a tax on the whole stockpile until renewal of the navigation season.

[12] It certainly seems very artificial and a strange commentary on plaintiff's business acumen to insist that a 14 day supply was sufficient for its current operational needs when in fact it had a supply almost 20 times that.

counsel's arguments have referred significantly to *Knight Newspapers, Inc v Detroit,* 16 Mich App 438 (1969) and *Denver v Denver Publishing Co,* 153 Colo 539; 387 P2d 48 (1963). We will therefore comment briefly on their applicability to this case.

Insofar as *Knight* adopts "[t]he rule and formula used in the *Denver Case"* as the rule in Michigan, 16 Mich App 438, 442, it is disapproved and overruled. This Court prefers to, and must rely on the original and basic authority of *Youngstown.* However, whether the decision reached in *Knight* is correct or incorrect is not before us. As *Denver* says, "[t]here is no rigid and inflexible rule which can be laid down to determine the 'current operational needs' of a taxpayer. This is an area where in the policy of the law dictates ad hoc determinations based on the facts presented in each particular case." 153 Colo 539, 548–549; 387 P2d 48, 53. *Knight* appears to raise the question of assessing the entire import or of an "arbitrarily set" 15 days' supply standard. 16 Mich App 438, 440. We have expressly reserved the question of assessing the entire import and, of course, we do not have before us the record to judge whether or not the 15 day standard was arbitrary or reasonable.

As to *Denver,* we have reserved the question on which it rules, namely whether the whole import is assessable, and we see no purpose in limiting the broad general rules of *Youngstown* by raising "the distinction between 'current operational needs' and good business practices dictated by prudent management," if indeed there necessarily is any distinction. In any event, *Denver's* comment, quoted above, against a "rigid and inflexible rule" in these cases, we believe the better lesson from this case. Furthermore, it is not at all certain

that the decision does not support defendant's formula as it is based on replenishment from Canada although the taxpayer also had a domestic source. See *Beall Pipe & Tank Corp v State Tax Commission,* 254 Or 195, 200; 458 P2d 420, 423 (1969) interpreting *Denver* as determining "current operational needs on the basis of the length of time required to secure additional supply from the foreign source."

The Court of Appeals and the circuit court are reversed. The case is remanded to circuit court for further proceedings consistent with this opinion. No costs, a public question.

T. M. Kavanagh, C. J., and T. E. Brennan, and Swainson, JJ., concurred with Williams, J.

Levin, J. *(concurring).* The immunity from state taxation of imports under the United States Constitution "survives their arrival in this country and continues until they are sold, removed from the original package, or put to the use for which they are imported." *Hooven & Allison Co v Evatt,* 324 US 652; 65 S Ct 870; 89 L Ed 1252 (1945).

We know from *Hooven* that commodities imported for use in manufacturing, like commodities imported for other uses, retain their immunity until they are

—"used" by the importer, per Chief Justice Marshall in *Brown v Maryland,* 25 US (12 Wheat) 419; 6 L Ed 678 (1827), or

—"put to the use for which they are imported," per Chief Justice Stone in *Hooven & Allison Co v Evatt, supra.*

*Youngstown Sheet & Tube Co v Bowers,* 358 US 534; 79 S Ct 383; 3 L Ed 2d 490 (1959), distinguished *Hooven* on the basis that the imported

commodities in the consolidated *Youngstown* cases had been "found to have been essential to current operational needs", and had been "used"/"put to use".

*Youngstown* does not, however, support the intimation in the opinion of the Court in this case that "all imports present on the taxing day" might be subject to taxation.[1] *Youngstown,* while distinguishing *Hooven,* was decided within its framework and holding described in *Youngstown* as follows (p 542):

> "In *Hooven* [citation omitted] it was held that goods imported for 'use' share the same immunity as goods imported for 'sale,' and that goods imported 'for manufacture [do not] lose their character as imports any sooner or more readily than imports for sale' *(id.,* at 667); but when [the imported goods are] used for the purpose for which they are imported, they cease to be imports and their tax exemption is at an end.' *Id.,* at 665." (Brackets by the Court.)

The question then is how does one determine when goods imported for manufacture are "used for the purpose for which they are imported," or, as the *Youngstown* Court elsewhere phrased the question: "Do the facts as stipulated and found in the cases before us, when considered in the light of applicable legal principles, show that these manufacturers *have so acted upon the imported materials* as to cause them to lose their distinctive character as 'imports'[2] by irrevocably committing them,

---

[1] The opinion of the Court, in accordance with the stipulation of the parties, limits taxation in the year 1967 (see fn 9) as well as the year 1966 to 2-1/2 months' usage.

[2] The phrase "so acts upon the imported materials as to lose their distinctive characteristics as 'imports' " is derived from words written by Chief Justice Marshall in *Brown v Maryland,* 25 US (12 Wheat) 419, 441; 6 L Ed 678 (1827): "so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country". This concept of "so acting upon" the import has been

after their importation journeys have definitely ended, to 'use in manufacturing' at the plant and point of final destination, and by 'entering' and 'using' them 'in manufacturing' at that place?" (Emphasis by the Court.) *Youngstown, supra,* p 543.

I

The Detroit taxing authorities read the *Youngstown* case—at least for the purposes of this case— as subjecting Production's inventory of imported steel to state taxation to the extent only of its "current operational needs." Both the taxing authorities and Production have agreed, as stated in the brief filed by the taxing authorities, that " 'current operational needs' are to be measured by the *replenishment time* of the steel in question."[3]

The "replenishment time" test is derived from *Denver v Denver Publishing Co,* 153 Colo 539; 387 P2d 48 (1963), and was adopted by the Court of Appeals in *Knight Newspapers, Inc v Detroit,* 16 Mich App 438; 168 NW2d 318 (1969).[4]

---

applied in both subsequent import for sale and import for use cases down through the latest United States Supreme Court decision, *Youngstown,* where the Court began its opinion by stating the "principal question presented" in those terms.

[3] The Court of Appeals stated the question as follows:

"Therefore the question we are called upon to decide is whether or not replenishment time for the application of 'current operational needs' formula is to be measured by the replenishment time from foreign sources or by the actual replenishment time immediately after the tax date." *Production Steel Strip Corp v Detroit,* 42 Mich App 698, 702; 202 NW2d 719, 721 (1972).

[4] The replenishment time test was also adopted and followed in *Orr Felt & Blanket Co v Schneider,* 3 Ohio St 2d 14; 209 NE2d 150 (1965); *Beall Pipe & Tank Corp v State Tax Commission,* 254 Or 195; 458 P2d 420 (1969); *Emhart Corp v Town of West Hartford,* 28 Conn Sup 134; 253 A2d 670 (1968).

Other courts have permitted taxation of the entire inventory without regard to the replenishment time where "indiscriminate portions

Without the benefit of adversary presentation on the appropriateness of this test, the opinion of the Court declares that "[i]nsofar as *Knight* adopts '[t]he rule and formula used in the *Denver Case*' as the rule in Michigan, 16 Mich App 438, 442, it is disapproved and overruled."

The Court so rejects the replenishment time test after explaining its reversal of the Court of Appeals' decision on a basis neither briefed nor argued, nor mentioned in the decisions and opinions filed by the circuit and appeals courts.

The parties having agreed that the pertinent inquiry is Production's "current operational needs" and that those needs are to be measured by the replenishment time test, the question before us, again as stated by the taxing authorities, is whether the taxing authorities have "a right to assess foreign steel inventory in the amount of 2 1/2 months' usage based on a 2 1/2 month replenishment lead time from foreign suppliers" or whether Production is correct in contending that "only 1/2 month's usage is necessary to satisfy current operational needs and only that amount is assessable, because on tax day Production could replenish steel from domestic sources within 1/2 month."

Foreign and domestic steel are functionally ("so far as utility is concerned"), or at least the parties so stipulate, the same. Although Production was using foreign steel both during the 1/2 month

of the whole" were used or were commingled with other supplies. *Virtue Bros. v Los Angeles County,* 239 Cal App 2d 220, 231; 48 Cal Rptr 505 (1966); *In re Asheville Citizens-Time Publishing Co,* 281 NC 210, 220; 188 SE2d 310, 316 (1972).

*See, generally,* Glander, *A Practical Approach to the Tax Immunity of Imports for Use in Manufacturing,* 18 Nat'l Tax J 328 (1965); Note, *Imports for Sale v Imports for Manufacture,* 24 La L Rev 909 (1964); Note, *States May Tax Imports Held in Bonded Smelting and Refining Warehouses,* 23 Vand L Rev 437 (1970).

replacement period (contended for by Production)
and the 2-1/2 months period (contended for by the
taxing authorities), it could have satisfied all its
operational needs throughout the 2-1/2 months
period with domestic steel having a replacement
lead time of 1/2 month.[5]

The replenishment time test is a two-factor test:
(i) time required to obtain additional supplies of
the commodity, and (ii) quantity used during that
period.

While the parties disagree on whether the appli-
cable time is the time required to obtain additional
supplies from foreign sources or from domestic
sources, in their stipulation they have computed
the quantity factor based on the actual amounts of
*foreign* steel used after the tax day (December 31)
during the 1/2 month and 2-1/2 months periods.

The parties, thus, are in apparent agreement
that the term "current operational needs" refers
not to the importer-manufacturer's entire need for
supplies of the commodity but rather to so much
of his need as is filled with foreign supplies, and
that the quantitative amount of his foreign supply
needs is to be determined by his actual usage of
foreign supplies during the relevant replacement
time period.[6]

Turning to the time factor, both parties urge us
to look at the "actual" time of replacement. Pro-
duction contends that the actual time of replace-
ment is the 1/2 month lead time required for

[5] Indeed, Production's argument might be extended to support the
conclusion that none of the inventories of imported steel were subject
to taxation since it is apparent that Production could have supplied
from domestic steel on hand on the tax day all its needs during the
first 1/2 of January as well as the balance of the 2-1/2 months period.

[6] The quantitative amount of foreign supply usage so determined
would not be affected by the fact that the importer-manufacturer's
needs could be met with functually equivalent supplies of the com-
modity purchased domestically.

acquiring the domestic supplies of steel Production was actually purchasing and receiving in the January-March period. The taxing authorities contend that the actual time of replacement is the time required to obtain a new supply from the foreign sources actually being used by the importer-manufacturer, in this case, by stipulation, 2-1/2 months.

We are persuaded that the taxing authorities have the better of the argument.

The agreed-upon inquiry is current operational needs. The agreed-upon test for determining current operational needs is replenishment time. The agreed-upon quantity factor to be used in applying that test is actual usage during the relevant replacement time of December 31 inventory acquired from foreign sources.

It seems more consonant with the concept of a test designed to measure current operational needs —by stipulation meaning the importer-manufacturer's usage of foreign supplies during the relevant replacement period—to determine the time portion of the equation based on the time required to obtain replacement supplies from the foreign sources actually being used.

While Production might have covered with domestic steel its customer requirements during the 2-1/2 months agreed-upon time for acquiring new supplies of foreign steel, it chose, for whatever reasons, to meet those requirements with steel purchased abroad.

"Current operational needs"—assuming as the parties do that it is the relevant criterion—does not seek to measure the importer-manufacturer's need for domestic supplies but rather the quantities of foreign supplies required to maintain the segment of his manufacturing operations he chooses to stoke with foreign supplies. Under the

replenishment time test, if an importer-manufacturer meets his needs from domestic supplies during the relevant replacement time period, if he does not actually use his foreign inventories during that period, the quantity factor of the two-factor replenishment time test would be zero and, therefore, none of his foreign inventories would be subject to taxation. In such a case it would make no sense to allow the tax collector to substitute the manufacturer's actual domestic usage on the ground that the manufacturer *might* have met his customer requirements out of his foreign inventories.

Similarly, we reason that it would be inconsistent with the function of the replenishment time test, as a measure of the quantity of foreign supplies used and time required to obtain replacement supplies, to multiply foreign inventory usage times a replacement time for supplies which are not actually used to displace foreign supplies in meeting customer requirements.

In *Orr Felt & Blanket Co v Schneider,* 3 Ohio St 2d 14, 24; 209 NE2d 150, 156; 32 Ohio Opinions 2d 13 (1965), the Ohio Supreme Court, faced with a similar question, said:

"[A]lthough the evidence indicates that the taxpayer *could* have secured a new supply of imported grease wool from eastern importers within 30 days, the taxpayer chose to import its own grease wool from foreign countries * * * .

"The taxpayer having made this choice, the rule applied to the taxpayer should be that the amount of grease wool removed from the bonded warehouse and in inventory which is required to meet 'current operational needs' for the length of time it takes to secure an additional supply from the foreign source which the taxpayer has selected to supply its grease wool is taxable." (Emphasis supplied.)

Production distinguishes this case on the ground that, in contrast with the taxpayer in the Ohio case, it was actually buying steel on the tax date from domestic sources. While that is true, it was not meeting its *relevant* operating needs with the domestic supplies so purchased. If it were, then the amount of the quantity factor would, to that extent, have been reduced.

If Production had met all customer requirements from domestic supplies, if domestic supplies replaced dependence on the December 31 inventory of foreign supplies, then, as of the end of the 1/2 month period Production would have us adopt, the quantity factor of the two-factor equation would be zero and Production would have achieved by its own method of operation what it seeks to accomplish by this action.

We conclude, subject to the agreed-upon computations set forth in the stipulation of the parties, that the portion of Production's December 31 inventory of foreign steel subject to taxation is the amount needed to cover Production's actual usage of foreign steel in the 2-1/2 months agreed-upon time required to obtain new supplies of foreign steel.

## II

This Court, without briefing or argument directed to the question of the propriety of the replenishment time test, rejects that test and derives its own which at once both begs the question and seems to leave the matter at large in the discretion of the tax assessor subject to the supervision of the State Tax Commission. This Court writes:

"A fair conclusion to be drawn from *Youngstown* is

that the United States Supreme Court grants the states
a reasonable amount of latitude in determining what
'current operational needs' are *once* it is clear that the
'manufacturers have so acted upon the imported mate-
rials as to lose their distinctive character as "imports" '.
358 US 534, 543." (Emphasis supplied.)

This Court thereby treats "current operational
needs" as a concept separate from "so act[ing]
upon the imported materials as to lose their dis-
tinctive character as 'imports' ". But the rationale
of *Youngstown* was that *because* of the proven
current operational needs of the importer-manu-
facturers, they would, on the facts, record and
findings in the consolidated cases, be deemed to
have so "acted upon" the imported materials.

The distinction which Chief Justice Marshall
said exists and "must be marked as the cases
arise", *Brown v Maryland, supra,* p 441, ceases to
exist as a perceptible rule of law insofar as com-
modities imported for use in manufacturing in
Michigan are concerned if as soon as the commod-
ty hits the dock it becomes, apparently as a
matter of law, part of the "supply line",[7] and, ergo,
"irrevocably committed to 'use in manufacturing'
at [the] plant" for which it is destined. *Cf. Beall
Pipe & Tank Corp v State Tax Commission,* 254 Or
195; 458 P2d 420 (1969).

In *Youngstown* the Court distinguished *Hooven*
on the ground that "these are not cases of the

_____

[7] The opinion of the Court states:

"The service of supply in *Production Steel* does not consist of
' "piles" in the "ore yards" to "stock bins" ' exactly. But the flow of
material from boat docks and surrounding warehouses to the factory
curtilage and into the factory itself is certainly the same kind of
manufacturing materials feeding process with which almost everyone
in Michigan is generally familiar. So the supply line in *Production
Steel* is strictly comparable to *Youngstown.*

"The aforementioned comparative analysis brings *Production Steel*
within the *Youngstown* rule relative to losing the 'distinctive charac-
ter of imports', etc."

mere storage in a warehouse of imported materials intended for eventual use in manufacturing". Clearly then a line must yet be drawn between mere storage for *"eventual* use" and "use"/"putting to use"/"acting upon". The courts of other states have taken varying approaches in their line-drawing efforts, and the several approaches (see fn 4) are each arguably correct.

Sometimes it is difficult to evaluate the significance of statements and phrases in a lengthy opinion of the United States Supreme Court, whether they are merely descriptive or are limiting or are intended to lay down a rule. We would reserve until a case where the question is briefed and argued any attempt to explicate *Youngstown* or to generalize about where the line should be drawn.

Reasoning from one analogy to another can carry one into infinity. Merely because the *Youngstown* Court upheld the taxation of all the ores at Youngstown's plant and said it could see no valid basis for distinguishing between the ores in stock bins containing one or two days' supply located in close proximity to the furnaces (conceded by Youngstown to be subject to taxation) and ores in the ore yard piles a short distance further away (claimed not to be taxable), does not mean that the Court would hold to be taxable separately identifiable steel coils located, not at the plant but at the waterfront, coils perhaps part of an unbroken lot or order or, indeed, an unbroken shipment.

In *Youngstown,* the imported iron ore had been *"commingled* with other iron ore imported at a different time." "[P]ortions of such iron ore [had] been removed for use in manufacturing." (Emphasis supplied.) "[I]ndiscriminate portions of the

whole" importation of veneers were actually being used. Thus, in a sense, in the consolidated cases dealt with in *Youngstown,* the larger "package"— the "whole"—had been broken. Similarly, see *In re Asheville Citizens' Time Publishing Co,* 281 NC 210, 220; 188 SE2d 310, 316 (1972); *Virtue Bros v Los Angeles County,* 239 Cal App 2d 220, 231; 48 Cal Rptr 505 (1966).

Steel coils are not, like iron ore or lumber, a fungible mass (received in "bulk" or as "loose, individual pieces"), one piece indistinguishable from another. Steel coils, in contrast with ores or lumber or veneer, vary from one another in guage, width, length, alloy, other components, finishes and quality.

Of course, as the opinion of this Court emphasizes, the foreign steel was imported by Production "for use in manufacturing", "to meet its estimated [manufacturing] requirements" at the plant. *Youngstown, supra,* p 546. That is true of every importation of supplies for manufacturing purposes; all commodities imported for use in manufacturing are imported to supply manufacturing needs and upon unloading, indeed even before unloading, are a part of the "supply line".

The coils still warehoused near the dock, 14 miles from Production's plant, had not "arrived at their destination". *Youngstown, supra,* p 546.[8] Production did not concede, the circuit court, therefore, could not and did not find, that the imported steel was "essential to the operation" or "irrevoca-

---

[8] It appears that $974,070 of imported steel was located at Production's plant on December 31, 1965. The value of imported steel found to be taxable by the assessors in 1966 was $1,053,000 or $79,000 more than the value of such steel located at the plant.

The stipulation states that "[o]n the tax date Production Steel Strip, Inc. had sufficient steel coils [imported or domestic or both?] at its plant on Sherwood for its needs for about two months."

bly committed to 'use in manufacturing' at that plant and point of final destination" within the meaning of *Youngstown, supra,* pp 545–546.[9] Production stipulated, rather, to try this case on certain agreed-upon facts and a narrow issue—replenishment time.

We would dispose of this case on the stipulated facts and issues which able counsel on both sides framed.

T. G. KAVANAGH and M. S. COLEMAN, JJ., concurred with LEVIN, J.

[9] The order of the State Tax Commission for tax year 1966 does state that "[t]he amount of inventory valued in the appraisal [of the commission's staff] was determined by estimating that a 2-1/2 month usage was 'essential to current requirements.' "

It further appears from Production's complaint in the circuit court for tax year 1967 that the "amounts so determined by the Assessors to have so lost its exemption was the entire amount of such imports and was not limited to two and one-half (2 1/2) months processing and shipment".

The actions now before us, seeking a refund of taxes paid for tax years 1966 and 1967, were, however, tried on a stipulation of facts which does not concede the correctness of such determinations.