IN THE MATTER OF THE APPEAL OF ASHEVILLE CITIZEN-TIMES PUB-
LISHING COMPANY FROM AN ACTION OF THE BUNCOMBE COUNTY BOARD
OF TAX SUPERVISION, SITTING AS THE BOARD OF EQUALIZATION AND
REVIEW, DENYING THE REQUEST FOR EXEMPTION FROM AD VALOREM TAX-
ATION CERTAIN IMPORTED PROPERTY OWNED BY THE APPELLANT AND
LOCATED IN BUNCOMBE COUNTY AS OF JANUARY 1, 1970.

No. 109

(Filed 10 May 1972)

**1. Taxation § 9.5— taxes on exports or imports — U. S. Constitution**

The purpose of Art. I, § 10[2.] of the U. S. Constitution, pro-
hibiting a state tax on imports, is to prevent the coastal states, and
other states through which imports must pass, from levying a tax
on imports before they reach their destination, so as to impede the
free flow of goods between the states, and so as to prevent encroach-
ment by the state upon taxing powers reserved exclusively to the
national government.

**2. Taxation § 9.5— state taxes on imports — current operational needs**

When goods are needed, imported and irrevocably committed to
supply and are actually being used to supply the daily requirements
of a manufacturer, they are being used for "current operational
needs" so as to lose their character as imports and their immunity
from state taxation.

**3. Taxation § 9.5— state taxes on imports — use or storage**

Neither the size of the supply of imported materials on hand
nor the distance the materials are stored from the point of fabrica-
tion or consumption determines whether they are being used or merely
stored, the treatment of the goods by the importing manufacturer
being the critical test.

**4. Taxation § 9.5— taxes on imports — current operational needs —
time necessary for delivery**

Contention that "current operational needs" of imported newsprint
must be determined by mutiplying the number of days necessary for
the imported goods to be shipped from the place of origin to des-
tination by the average daily requirement of such goods by the
importer-manufacturer is without merit.

**5. Taxation §§ 9.5, 25— ad valorem taxes — imported newsprint — cur-
rent operational needs**

A four-to-six weeks supply of newsprint ordinarily kept on hand
by a newspaper publishing company, and on hand on the taxing date,
including imported newsprint, constituted the "current operational
needs" of the publishing company and was subject to ad valorem
taxation.

6. Taxation § 9.5— imported newsprint — ad valorem taxes — "original package" doctrine

 The "original package" doctrine has no application in determining whether ad valorem taxes may be imposed on imported newsprint where the newsprint was being used on the taxing date for the purposes for which the taxpayer imported it.

APPEAL by plaintiff from *Martin, J. (Harry)* at the October 1971 Civil Session of BUNCOMBE Superior Court.

The Asheville Citizen-Times Publishing Company (taxpayer) requested the Board of Supervision of Buncombe County, sitting as the Buncombe County Board of Equalization and Review, to exempt it from ad valorem taxes on that portion of imported newsprint on hand as of 1 January 1970 which exceeded the average amount of newsprint used by it during a 6-day period. The taxpayer contended that such newsprint as was necessary to meet its "current operational needs" was taxable, and that "current operational needs" should be measured by the length of time it takes to get an additional supply of newsprint from its foreign supplier, in this case six days. However, the Buncombe County Board of Equalization and Review concluded that the four to six weeks supply ordinarily kept on hand by the taxpayer, and on hand on the taxing date, consisting of 293.1 tons of imported newsprint and 191.6 tons of domestic newsprint, constituted the "current operational needs" of the taxpayer. Pursuant to this conclusion, the Buncombe County Board of Equalization and Review, on 3 August 1970, denied the request for exemption. The taxpayer appealed to the North Carolina Board of Assessment, contending that the County was imposing a tax on imports in contravention of Art. I, § 10 [2.], of the United States Constitution, which, in part, provides: "No state shall, without the consent of congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws, . . . "

The uncontradicted evidence disclosed by the affidavit testimony of Mr. John Q. Schell, General Manager of the taxpayer, answers by Mr. Schell to interrogatories submitted to him, and a copy of the contract between taxpayer and one foreign supplier for the purchase and sale of newsprint, shows that the newsprint is delivered to and placed in an underground storage warehouse located in a building adjacent to the building housing the printing facilities and general offices of taxpayer;

that the newsprint is moved from the underground warehouse to a storage room adjacent to the printing area as it is needed in order to maintain a four to six day supply in the storage room. The newsprint is wrapped in heavy kraft paper, which is removed just before the actual use of the newsprint on the presses. Pursuant to the written contract between taxpayer and one of its Canadian suppliers, the taxpayer places monthly orders for newsprint. This contract, in part, provides:

"5(d) Unless the buyer shall furnish to International (supplier) by the 15th day of the month complete specifications expressed in tons of each width for the paper to be shipped the succeeding month, International may ship in accordance with specifications last received."

In connection with the purchase of newsprint, Schell, in his affidavit, *inter alia*, stated:

" . . . [W]e can, as a practical matter, and occasionally do place special, changed or unanticipated orders with any of our manufacturing suppliers. On these occasions we can also get delivery in Asheville of the newsprint ordered within six days after the manufacturer's receipt of our order, barring unusual circumstances."

The State Board of Assessment found facts consistent with the evidence above stated, concluded that appellant's entire supply of newsprint on hand as of 1 January 1970 constituted its "current operational needs," and sustained the action of the Buncombe County Board of Tax Supervision, sitting as the Buncombe County Board of Equalization and Review. The taxpayer filed a petition for review in Buncombe County Superior Court, and on 26 August 1971 Judge Harry Martin heard arguments of counsel and considered the record proper and briefs of counsel. On 8 October 1971 Judge Martin entered a judgment in which he, *inter alia*, found and concluded:

### FINDINGS OF FACT

"4. Taxpayer contends any newsprint on hand exceeding a six (6) day supply (6 x 13.8 tons, or 88.8 tons) is not a part of "current operational needs" but rather newsprint purchased and held in the exercise of "sound and prudent business judgment.""

---

In re Publishing Co.

---

"5. The Board concluded from the facts it found that a four to six weeks supply, some 489.972 tons, was required for taxpayer's "current operational needs" and held that this amount on hand January 1, 1970, the taxing date, was not exempt from taxation."

### CONCLUSIONS OF LAW

"1. Taxpayer has failed to produce evidence that the newsprint on hand January 1, 1970, in excess of a six (6) days supply (88.8 tons) was purchased in the exercise of sound and prudent business judgment as distinguished from current operational needs. There is no evidence that any of the paper was purchased at a favorable price or was of a particular quality not customarily obtainable, or that it was purchased for a particular purpose as distinguished from regular business operations, or that purchases in certain quantities had economic advantages, or that there was any threat to the foreign supply by way of strikes or otherwise.

"2. There is sufficient competent evidence in the record to sustain the Board's findings of fact, and its conclusion of law, that a four to six weeks supply of newsprint paper (489.972 tons) did on January 1, 1970, (the taxing date) constitute the current operational needs of the appellant taxpayer.

"3. That the Board's Decision that the property subject to the appeal, 489.972 tons of newsprint paper owned by the appellant taxpayer January 1, 1970, and then located within Buncombe County, is not exempt from ad valorem taxes under Article 1, Section 10, Clause 2, of the United States Constitution."

Judge Martin, after finding facts and entering his conclusions of law, affirmed the decision of the State Board of Equalization and Review. The taxpayer appealed to the North Carolina Court of Appeals, and on 7 March 1972 we allowed the party's petition for writ of certiorari to the North Carolina Court of Appeals prior to determination.

*McGuire, Baley & Wood, by Charles R. Worley, for Appellant Asheville Citizen-Times Publishing Company.*

*W. M. Styles for Board of Tax Supervision.*

BRANCH, Justice.

The constitutional question here presented is when, and to what extent, Buncombe County may levy an ad valorem property tax upon newsprint imported by a taxpayer for use in its printing operation.

[1]   Art. I, § 10 [2.] was inserted in the United States Constitution to prevent the coastal states, and other states through which imports must pass, from levying a tax on imports before they reach their destination, so as to impede the free flow of goods between the states, and so as to prevent encroachment by the state upon taxing powers reserved exclusively to the national government. *Brown v. Maryland,* 12 Wheat. 419, 6 L.ed. 678; *Youngstown Sheet and Tube Co. v. Bowers,* and *U. S. Plywood Corporation v. City of Algoma,* 358 U.S. 534, 3 L.ed. 2d 490, 79 S.Ct. 383.

In *Brown v. Maryland, supra,* Chief Justice John Marshall, writing for the Court, held that the national government had exclusive power to tax the act of importation, and that a state could not tax an imported good while it remained the property of the importer "in his warehouse, in the original form or package in which it was imported." However, the Chief Justice emphasized that there was a point of time when imported goods must lose their immunity and become taxable by the states. In this connection he said: "It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the State; . . . "

Without defining just what constituted such act or conduct, the Chief Justice listed some of the acts which would cause loss of the import characteristic. Included in this list was the act of an importer in bringing goods into this country for "his own use" and here using them for the purposes for which they were imported.

The United States Supreme Court again discussed the effect of "use" by an importer in the case of *Hooven & Allison Co. v. Evatt,* 324 U.S. 652, 89 L. 2d 1252, 65 S.Ct. 870. There the court concluded that goods imported for "use" by the importer were subject to the same immunity as goods imported

for sale, and the goods imported for "use" did not lose their character as imports more readily than did goods imported for sale. When the imported goods are merely in storage in the warehouse of the importer, the goods retain their character as imports, and, consequently, their immunity from state taxation. The court, however, recognized that when a manufacturer begins to use the imported goods in the manufacturing process, the goods lose their character as imports and their immunity from state taxation.

It was not until the United States Supreme Court decided the companion, landmark cases of *Youngstown Sheet & Tube Co. v. Bowers, and U. S. Plywood Corporation v. City of Algoma, supra,* that the court delineated the actual use by an importing manufacturer which served to remove the import character from a good.

In *Youngstown,* the stipulated facts show that imported iron ore was transported to the manufacturing plant and stockpiled with similar imported ore adjacent to the smelters. These stockpiles, segregated as to quality and point of origin, contained enough ore to meet smelting needs at the manufacturer's plant for approximately three months. Ore was removed periodically from these stockpiles and taken directly to the open hearth and blast furnaces. The manufacturer kept a one-to-two days supply of ore available continuously at each furnace facility. As ore was removed from the large stockpiles, the stockpiles were replenished with imported ore. It was further stipulated that this ore had been imported for manufacturing and for the purpose of meeting estimated requirements at the plant; that the "importation journey definitely had ended; (and) that the ores were irrevocably committed to use in manufacturing at that plant and point of final destination; . . . "

The U. S. Plywood Corporation imported unfinished "green" lumber "in bulk" and veneers "in bundles" at its facilities. Upon delivery at its plant, the lumber was unloaded and carried to the company's storage yard, located "adjacent to its plant," where it was stacked so as to allow the air to circulate and dry the lumber. The lumber was then taken from the storage yard and placed in a kiln for drying, and the lumber was thereafter used in the manufacturing process. The veneers, imported from three countries, were received in bundles and kept in that form at the taxpayer's plant for use as needed in the day-to-day

operation of the plant. In the *Plywood* case the state court found as facts that the lumber and veneers had been imported for use in manufacturing at the Algoma plant; that upon arrival there the importation journey ended; that these materials were irrevocably committed to use in manufacturing at that plant; that these materials were "necessarily required to be kept on hand to meet (its) current operational needs"; and that these materials were actually being used at the plant to supply those needs. These findings were not attacked in the appeal to the United States Supreme Court.

In *Youngstown* the taxing authorities levied an ad valorem assessment against the full value of all the ore in the plant's stockpiles; in *Plywood* the authorities levied an assessment against only one-half the value of the imported materials located at the manufacturing plant. In affirming these levies, the United States Supreme Court held that the stipulated facts in *Youngstown* and the facts found by the court from sufficient evidence in *Plywood* showed that the manufacturers had "so acted upon the imported materials . . . for the purpose for which they were imported, that . . . they must be held to have then entered the manufacturing process."

The court held that the "original package" concept as applied to goods imported for the purpose of sale in the case of *Brown v. Maryland, supra,* did not exempt goods from taxation when such goods were imported for use in manufacturing and were in fact effectively subjected to such use before the original packaging was removed.

In discussing this holding, the court, in part, stated:

"The materials here in question were imported to supply, and were essential to supply, the manufacturer's current operating needs. When, after all phases of their importation had ended, they were put to that use and indiscriminate portions of the whole were actually being used to supply daily operating needs, they stood in the same relation to the State as like piles of domestic materials at the same place that were kept for use and used in the same way. The one was then as fully subject to taxation as the other. In those circumstances, the tax was not on 'imports', nor was it a tax on the materials because they had been imported, but because at the time of the assessment they

were being used, in every practical sense, for the purposes for which they had been imported. They were therefore subject to taxation just like domestic property that was kept at the same place in the same way for the same use. We cannot impute to the Framers of the Constitution a purpose to make such a discrimination in favor of materials imported from other countries as would result if we approved the views pressed upon us by the manufacturers. Compare *May v. New Orleans,* 178 U.S., at page 509."

[2] The opinon in *Youngstown Sheet and Tube Co. v. Bowers, supra,* furnishes criteria for determining what imported goods are within the classification of "current operational needs" so as to lose their character as imports and their immunity from state taxation. The essence of these criteria may be stated as follows: When goods are needed, imported and irrevocably committed to supply and are actually being used to supply the daily requirements of a manufacturer, they are being used for "current operational needs."

[3] Neither the size of the supply on hand nor the distance the materials are stored from the point of fabrication or consumption, determines whether a good is being used or merely stored. *Hooven & Allison Co. v. Evatt, supra; Youngstown Sheet & Tube Co. v. Bowers, supra.* The treatment of the imported goods by the importing manufacturer is the critical test.

Thus, a supply of imported ore to meet its estimated requirements for a period of at least three months in the *Youngstown* case, and one-half of an unspecified supply of imported veneer in the *Plywood* case were held to be in use for the purposes for which they were imported, and, therefore, subject to taxation by the state. (We note that the one-half determination in the *Plywood* case was the decision of the local taxing authority and not of the United States Supreme Court. In reaching its decision the Supreme Court apparently did not consider the lapse between the time the manufacturer placed an order with the foreign supplier and the time the manufacturer received the goods.)

[4] Appellant argues that "current operational needs" should be determined by multiplying the number of days necessary for the imported goods to be shipped from the place of origin to destination by the average daily requirement of such goods by

the importer-manufacturer. In support of this contention appellant relies on *Hooven & Allison Co. v. Evatt, supra,* decided ten years prior to *Youngstown Sheet & Tube Co. v. Bowers, supra.* The later case specifically points out that *Hooven & Allison Co. v. Evatt* did not reach, but expressly reserved, the crucial question here presented. In that case it is stated:

> "[I]t is unnecessary to decide whether, for purposes of the constitutional immunity, the presence of some fibers in the factory was so essential to current manufacturing requirements that they could be said to have entered the process of manufacture and hence were already put to the use for which they were imported before they were removed from the original packages."

Appellant relies heavily on the line of authority represented by *City and County of Denver v. Denver Publishing Company,* 153 Colo. 539, 387 P. 2d 48. In that case the Board of Equalization of the City and County of Denver upheld the assessment of ad valorem taxes on all newsprint which taxpayer imported from Canada and held for storage in its warehouses and publishing plant. The facts show that taxpayer imported 99% of its newsprint and used three separate warehouse facilities to store its large newsprint demands. The Supreme Court of Colorado held that the crucial issue was the amount of newsprint required to meet "current operational needs." It adopted the trial court's holding that "current operational needs" is defined in terms of the 6-day period needed to fill an order for newsprint as multiplied by daily requirements. However, in so holding, the court stated:

> "There is no rigid and inflexible rule which can be laid down to determine the 'current operational needs' of a taxpayer. This is an area wherein the policy of the law dictates *ad hoc* determinations based on the facts presented in each particular case. The trial court in the instant case held that since it took six days for the taxpayer to replenish its supply of newsprint from Canada and since the taxpayer used 60 tons of newsprint per day, the amount necessary for 'current operational needs' was 360 tons and that this amount was taxable even though all the newsprint remained in its original package until actually being made ready for the presses. We approve the formula in the instant case and cannot conclude that as a matter of

law the court made an erroneous determination of the 'current operational needs' of the taxpayer."

For other cases in this line of authority, see: *Knight Newspapers, Inc. v. City of Detroit,* 16 Mich. App. 438, 168 N.W. 2d 318; *Wheeling Steel Corp. v. Porterfield,* 14 Ohio St. 2d 85, 236 N.E. 2d 652; *Republic Steel Corp. v. Porterfield,* 14 Ohio St. 2d 101, 236 N.E. 2d 661; *Beall Pipe and Tank Corp. v. Tax Comm.,* 254 Or. 195, 458 P. 2d 420; *Lumber Co. v. Tax Comm.,* 255 Or. 13, 463 P. 2d 590; *Emhart Corp. v. Town of West Hartford,* 28 Conn. Supp. 134, 253 A. 2d 670.

*Denver* differs from *Youngstown, Plywood,* and instant case in that in *Denver* the taxpayer's use of three large, storage warehouses indicates storage rather than use. However, we think that the primary reason for the different results in these cases lies in the fact that the local fact-finding bodies found facts which compelled different conclusions. Obviously *Denver* and the other cases which reached like results recognized the desirability and practicality of retaining a broad discretion in the local fact-finding body. This is entirely consistent with the holdings in *Youngstown* and *Plywood.*

Our research discloses that none of the cases in the line of authority represented by *Denver* have been before the United States Supreme Court upon appeal; nor do we find that the United States Supreme Court has considered a petition for certiorari in any of these cases.

We find two recent decisions by the California Court of Appeals which reject the "time necessary for delivery" rule as adopted in *Denver,* and specifically apply the criteria as set forth in *Youngstown* and *Plywood. Virtue Bros. v. County of Los Angeles,* 239 Cal. App. 2d 220, 48 Cal. Rptr. 505, and *American Smelting & Refining Co. v. County of Contra Costa,* 271 Cal. App. 2d 437, 77 Cal. Rptr. 570. The United States Supreme Court denied taxpayer's petition for certiorari in *Virtue Bros. v. County of Los Angeles,* 385 U.S. 820, 17 L.ed 2d 58, 87 S.Ct. 45. In *American Smelting & Refining Co. v. County of Contra Costa,* the taxpayer appealed to the United States Supreme Court, and this appeal was dismissed for want of a substantial federal question. 396 U.S. 273, 24 L.ed. 2d 462, 90 S.Ct. 553. Taxpayer's moton for a rehearing was denied by that same court. 397 U.S. 958, 25 L.ed. 2d 144, 90 S.Ct. 940.

In instant case the imported newsprint had reached the end of its importation journey and had there been indiscriminately co-mingled with domestic newsprint. The uncontroverted statement of the taxpayer's general manager that, "inside our 14 O'Henry Avenue building and adjacent to our printing press area in that building, we have space for and maintain on hand the necessary quantity and sizes of newsprint for four to six days of our anticipated production needs from time to time," leads us to the inescapable conclusion that there was a continuous day-to-day use of the newsprint stored in the underground warehouse in connection with taxpayer's printing operation.

On 1 January 1970 (the taxable date) appellant had on hand approximately a four-to-six weeks supply of newsprint, of which 40.2612% was domestic newsprint. The domestic newsprint was unquestionably subject to the ad valorem tax assessed by the county, and it follows that the assessment on the entire supply as it affected the imported newsprint was nondiscriminatory.

The tax was not on imports. It was a nondiscriminatory tax on newsprint which had lost its character as an import because at the time of the assessment it was being used, in every practical sense, for the purpose for which it had been imported. The newsprint was, therefore, subject to taxation in the same manner as the domestic newsprint which was kept at the same place, in the same manner, and for the same use.

We have difficulty connecting the importation of the newsprint with the tax assessed on the newsprint. Certainly, assessment of the tax by the North Carolina authorities upon personal property which had been received and manufactured, and the finshed product distributed in this state, could not possibly contravene the intent of the framers of the Constitution that free flow of goods between the states be not impeded by state taxation. The newsprint, imported and domestic, stored in taxpayer's underground warehouse was as much a part of taxpayer's "manufacturing process" as was the four-to-six days' supply of newsprint stored adjacent to the printing press area.

We see no reason to construe the appropriate tax statutes and ordinances of this jurisdiction so as to require, as a matter of law rather than fact, that the term "current operational

needs" be given a more restricted meaning than that set forth in *Youngstown* and *Plywood*.

The evidence in this case supports the facts found by the State Board of Assessment, and these findings support the conclusion of law entered by the reviewing judge of the Superior Court, "that a four to six weeks supply of newsprint paper . . . did on 1 January 1970 (the taxing date) constitute the current operational needs of the appellant taxpayer." This conclusion and the resulting affirmance of the decision of the State Board of Equalization and Review by the Judge of Superior Court is entirely in accord with the principles of law set forth in the cases of *Youngstown* and *Plywood*.

[5] We conclude that the case of *Youngstown Sheet & Tube Co. v. Bowers, supra,* is controlling and that the four-to-six weeks supply of newsprint on hand on 1 January 1970 constituted taxpayer's current operational needs and was subject to the ad valorem taxes.

[6] The "original package" doctrine has no application under the facts of this case, since on 1 January 1970 the newsprint was being used for the purposes for which taxpayer imported it. *Hooven & Allison Co. v. Evatt, supra; Youngstown Sheet & Tube Co. v. Bowers, supra.*

The judgment of Judge Harry L. Martin, entered in the Buncombe County Superior Court on 8 October 1971, is

Affirmed.