IN THE MATTER OF: THE APPEAL OF HANES DYE AND FINISH-
ING COMPANY, WINSTON-SALEM, NORTH CAROLINA, AND
106 OF ITS CUSTOMERS FROM A DECISION OF THE STATE
BOARD OF ASSESSMENT REGARDING THE TAXABLE SITUS
AND VALUATION OF CLOTH GOODS OWNED BY THE 106
CUSTOMERS BUT IN HANES' POSSESSION IN WINSTON-
SALEM ON JANUARY 1, 1972.

No. 44

(Filed 30 August 1974)

1. **Taxation § 24— ad valorem taxes — greige goods in finishing plant —
nonresident owners — manufacturing**

Nonresident owners of textile greige goods shipped from outside
North Carolina to a textile finishing plant in Forsyth County for
processing and reshipment to the owners or to their customers were
not engaged in manufacturing in North Carolina, and the business
premises of the finishing plant were not also the business premises
of the nonresident owners for purposes of ad valorem taxation of the
goods. G.S. 105-304(b)(1); G.S. 105-304(d)(1), (2).

2. **Taxation § 24— ad valorem taxes — greige goods in finishing plant —
nonresident owners — purchase site — destination — tax situs**

Textile goods owned by nonresident converters which were shipped
from outside North Carolina to a textile finishing plant in Forsyth
County for processing and reshipment to the converters or to their
customers at designated places outside North Carolina, and which
were in the possession of the finishing plant on 1 January 1972, were
not "situated" or "more or less permanently located" in Forsyth
County on that date and, therefore, did not have a tax situs in Forsyth
County on that date.

3. **Taxation § 24— ad valorem taxation — greige goods in finishing plant
— resident owner**

Greige goods manufactured either inside or outside North Carolina,
shipped to a textile finishing plant in this State for processing, and
owned by a North Carolina corporation when in the finishing plant's
custody on January 1st are subject to ad valorem taxes in North
Carolina; whether such goods are taxable in the county where the
principal office and place of business of the North Carolina corporate
owner is located or the county where the property is physically situated
is a matter for determination by the State Board of Assessment.

4. **Taxation § 24— ad valorem taxes — greige goods in finishing plant —
nonresident owners — purchase site — destination — tax situs**

Textile goods in the custody of a finishing plant in Forsyth
County on 1 January 1972 which had been purchased by the nonresi-
dent owners from North Carolina mills for shipment to destinations
outside North Carolina after being processed by the finishing plant
or which had been purchased by the nonresident owners from mills
outside North Carolina for shipment to North Carolina customers

In re Appeal of Finishing Co.

after being processed by the finishing plant were subject to ad valorem taxation by Forsyth County.

Justice HIGGINS dissenting in part.

APPEAL by Forsyth County from *Armstrong, J.,* 26 March 1973 Special Session of the Superior Court of FORSYTH County, transferred for initial appellate review by the Supreme Court pursuant to G.S. 7A-31(a), docketed and argued as case No. 89 at Fall Term 1973.

The hearing before Judge Armstrong was on the petition of Hanes Dye and Finishing Company (Hanes) and 106 of its customers (102 being nonresidents of North Carolina and 4 being North Carolina corporations with principal offices and places of business in counties other than Forsyth) for judicial review of the decision of the State Board of Assessment (State Board).

The question is whether cloth materials owned by these 106 customers on 1 January 1972, but on that date in the custody of Hanes for finishing, had a tax situs in Winston-Salem, Forsyth County, North Carolina. If so, on what basis should the goods be appraised for ad valorem taxes?

The statutory provisions on which Forsyth County relies now appear in Chapter 105, Subchapter II, of the General Statutes of North Carolina (1972 Replacement). They were enacted by Chapter 806, Session Laws of 1971, and became effective on 1 July 1971. Unless otherwise specified, the references herein will be to provisions of the General Statutes in the 1972 Replacement.

G.S. 105-315(a) provides that every person who on January 1st has custody "of taxable tangible personal property" entrusted to him by another "for storage, sale, renting, or any other business purpose," shall furnish the tax supervisor of the county in which the property is situated a statement showing the name of the owner, a description of the property and the quantity thereof.

On 29 February 1972 Hanes furnished the Forsyth County Tax Supervisor a list of goods in its custody on 1 January 1972 belonging to 106 of its customers. Hanes submitted this list to avoid the penalties provided by G.S. 105-315(b) but did so under protest, contending that such report was not required because these goods were in Forsyth County, North Carolina, on a tem-

porary basis and therefore were not *taxable* tangible personal property.

After Hanes had filed the list, 54 of the 106 customers listed their cloth goods under protest to avoid any possible penalty for failure to list. The remaining 52 customers did not list their goods. Hanes and all of the 106 customers contended that the property did not have a tax situs in Forsyth County. Pursuant to stipulation, all of the property owned by the 106 customers was listed in the name of Hanes under the provisions of G.S. 105-306(c) (8).

Hanes and its 106 customers contested the listing of the cloth at hearings before the Forsyth County Board of Equalization and Review. At the conclusion thereof, the Board of Equalization and Review resolved (1) that the property had a tax situs in Forsyth County as of 1 January 1972; (2) that all of the cloth yardage of Hanes's customers who listed under protest be appraised at its "raw material value"; and (3) that the cloth goods of the customers who did not report be appraised at the rate of .2427 cents per yard—a figure arrived at by taking the total number of yards listed under protest by the reporting customers and dividing this figure into the total valuation placed on the goods of the reporting customers.

Hanes and its 106 customers appealed to the State Board from the decision of the Forsyth County Board of Equalization and Review that the goods in question had a tax situs in Forsyth County. Forsyth County appealed from its determination that the goods be appraised at their greige goods or raw materials value.

In answering the questions presented by the appeals, the State Board quoted and based its decision upon the following stipulated facts:

"1. Hanes Dye and Finishing Company (hereinafter sometimes referred to as 'Hanes') is a North Carolina corporation having its principal office and place of business in Winston-Salem, Forsyth County, North Carolina. Its only plant is located on Buxton Street in Winston-Salem, North Carolina. The Company bleaches, dyes and finishes cloth materials (greige goods) for its various customers. It is sometimes referred to in the industry as a commission finisher, meaning that it is commissioned to do dyeing and finishing of cloth for its customers. It does not do any dyeing or finishing in any other state although

it solicits orders and makes business calls on customers in other States.

"2. Hanes does not own any of the cloth dyed or finished by it but performs a service for its various customers and is paid several cents per yard depending on the dye or finish, for its service. The cloth is shipped or caused to be shipped to Hanes by the customer and after the dyeing and finishing is completed, the goods are shipped out in accordance with the instructions of the customer. There are over a thousand different types of dyes or finishes, or combinations thereof, any one of which may be prescribed by a particular customer. Upon completion of an order (the dyeing or finishing) Hanes submits its bill for its services to the customer which is due by the tenth of the following month.

"3. There are approximately 178 companies which did business with Hanes from time to time during the calendar year 1971. As of January 1, 1972, Hanes had in its possession the cloth of 106 different customers, as set forth in the report to the Tax Supervisor. As of June 28, 1972 (the day before hearings commenced in this matter before the Board of Equalization and Review), there were 31 of those 106 customers for which Hanes was not doing any dyeing or finishing work. However, Hanes may do work for the other 31 customers and its other customers from time to time during the year. The amount, size, dyeing or finishing which Hanes does for its customers varies from one customer to another. However, there is a degree of consistency in the type of work with respect to an individual customer. Repeat orders from a customer are dependent upon good customer relations, good quality work, prompt delivery and price. Hanes competes with other commission finishers located in various parts of the country.

"4. The customers of Hanes are usually referred to in the industry as 'converters'. A converter may obtain a contract for the sale of a particular cloth product to his customer and 'presell' (sell the cloth before he actually purchases it himself) the cloth before any other part of the transaction is initiated. After obtaining such contract, the converter then buys cloth known as 'greige goods' from a greige mill. Most of such mills are located in the Southern States. During 1971, approximately 10% of the greige goods shipped to Hanes came from greige mills in North Carolina. This percentage is closely representative of the past 3 or 4 years.

"5. The order of the converter from the greige mill is subject to variation. It may cover one quantity of goods destined for one specific purpose in the fulfillment of one specific contract. This is usually but not always the case with the converters dealing in comparatively larger volumes. The order for greige goods may also supply the converter with cloth destined for various purposes, one or more customers, and different uses.

"6. 'Greige goods' is simply a descriptive term for cloth which is untreated and undyed. It varies in width, weight per square yard, threads per square inch and fiber content, depending on the purpose for which it is to be used. In appearance, it looks very much like broadcloth and may be tinted in various colors at the greige mill. A particular converter may have one or two major customers or a dozen or more. Each of such customers will use the cloth for the purpose of the particular customer. The business of the converters falls into two broad categories, industrial and clothing. In the clothing category, the cloth is used for pockets, waistbands, and linings in various types of clothing, even including the inside lining of shoes. None of the cloth, in the clothing category, is used for an entire garment but as a component part thereof. The industrial category includes such items as headlinings and trim for automobiles as well as furniture, book covers, seat and chair covers, and practically any other product where cloth is a part of the manufactured product. The backing behind vinyl wall coverings and the basic foundation for many types of furniture coverings fall into this category.

"7. The many uses to which cloth is put are almost limitless. The number of dyes and finishes required for the various purposes is likewise almost limitless and Hanes, as one commission finisher, employs combinations of dyes and finishes in excess of one thousand. The cloth dyed or finished to be used as headliners in a given make and model of automobile is normally not usable for any other purpose. It is sold to the customer for the particular purpose he intends to make of it. Further, there are few clothing manufacturers which manufacture identical garments and the dye or finish used in one garment may vary from that in another garment.

"8. Once the dyeing and finishing is accomplished by Hanes, the cloth is ordinarily subject to cutting and sometimes further treatment before being incorporated into a finished product. For example, if the cloth is to be used for vinyl covered seat backs,

it has to undergo other treatment after it leaves Hanes before it can be used for this purpose. Cloth finished for pockets or waistbands has to be cut to the proper size before being incorporated into a garment. Generally speaking, the waistband manufacturer is a separate business from the manufacturer of the garment.

"9. More specifically, the work done by Hanes is carried out in the following manner:

"The greige goods are delivered from the greige mill to Hanes at its plant in Winston-Salem, North Carolina, usually by common carrier. At or about the same time a particular shipment of greige goods arrives, Hanes receives an order for dyeing or finishing from its customer. The order sets forth the specifications for the dyeing and finishing which Hanes is to do on the lot or lots contained in the shipment. The greige goods are received by Hanes in large rolls or in bales, ordinarily wrapped in burlap. The business is done in terms of 'lots'. During 1971, the average lot contained 30,000 yards of cloth. On occasion, a lot may contain as many as 200,000 yards and on rare occasions, as little as 5,000 yards. When the shipment is received by Hanes, the bale or roll numbers are recorded by a receiving clerk on a list under the name of the particular customer. This list is then forwarded by means of a vacuum tube system to the 'front office'. Secretaries in the front office then prepare a dye and finish Order. A dye and finish Order is then forwarded by the vacuum tube system to the 'Scheduling Department'.

"The function of the Scheduling Department at Hanes is to schedule the bleaching, dyeing and finishing and determine the completion date of goods received by Hanes. A particular Order may have to go through several different machines before the specified result is completed. The Scheduling Department takes into account the work on hand, the work force, the mathematical incidence of machinery breakdown, the routing of the goods through the different machines—and fixes a scheduled date for completion of the Order.

"The scheduling sheets are prepared daily by the Scheduling Department. Certain information from the scheduling sheet is recorded on the dye and finish Order.

"When the cloth goods are ready for delivery the Scheduling Department notifies the front office by means of the same vacuum tube system and the front office proceeds to bill the customer for the work done. The goods are shipped to the converter,

the customer of the converter or when further work is to be done on the goods, they are shipped to another business establishment for such work at the direction of the customer. As an illustration, the cloth finished for automobile headliners would be shipped directly to the plant of the automobile manufacturer. The cloth finished for trouser pockets would be shipped directly to such companies as Levi Straus or Farah. Where the cloth is to be used as backing for plastic seat covers, it may be shipped to another business establishment where the plastic covering is applied.

"10. The time the goods are at Hanes from receipt to shipment is generally 5 to 6 weeks or as little as 3 weeks. The time required for dyeing and finishing is an important consideration of Hanes' customers in placing orders with Hanes due to the demands of the industry. A given quantity of particular cloth is located at the Hanes plant on only one occasion, meaning while it is being dyed or finished and until shipped out.

"11. Generally speaking, lots are not broken. They come in as lots and go out as lots. The cloth comes in in the form of bales or rolls, is unpacked, dyed and/or finished, is repackaged and then goes out in the form of bales or rolls. On occasion and in the case of some converters with a number of smaller customers, they may order a large quantity of greige goods to get the benefit of a large volume price from the greige mill with the idea of using such goods to fill various purchase orders or contracts. In such instance, part of a given lot may receive different dyeing or finishing from another part and thereafter be shipped to different points. In other words, a given converter may want a number of rolls of cloth prepared in a particular finish or color for pockets and waistbands and may want another quantity for the same purpose but in a different shade or finish.

"12. During 1971, approximately 95.4% of all work done by Hanes was for customers having their principal office and place of business outside the State of North Carolina. The remaining 4.6% of the work was done by corporations having their principal office and place of business in North Carolina. The North Carolina corporations and their principal office and place of business were as follows:

Bunch Kelly
P. O. Box 457
Conover, North Carolina

In re Appeal of Finishing Co.

Burlington Greige Fabric
Box 21207
Greensboro, North Carolina

Carolyn Fabrics
948 West Green Drive
High Point, North Carolina

Jackson Buff Corporation
P. O. Box 398
Conover, North Carolina

"Approximately 95% of the goods shipped from Hanes during 1971 were shipped out of the State of North Carolina.

"13. Of the goods delivered to Hanes during 1971, approximately 85% were delivered by common carrier and the remainder by either customer owned or leased trucks. As of the end of 1971, approximately 77% of the goods were shipped out by common carrier. The remaining percentage of goods were shipped out by trucks owned or leased by the converters or their customers.

"14. The property reported by Hanes to the Forsyth County Tax Supervisor under the provisions of § 105-315 of the General Statutes of North Carolina was held on its (Hanes) records for the account of the companies listed in the report as of January 1, 1972.

"15. The work done at Hanes adds a value to the cloth dyed or finished. The parties disagree as to the extent of such value."

The State Board considered two questions, *viz:* 1. Did the subject property have a tax situs in Winston-Salem, Forsyth County, on 1 January 1972? 2. If so, did the County Board of Equalization and Review err in appraising the subject property at its "raw material value" as of that date? It answered both questions in the affirmative, setting forth with particularity the reasons underlying its decision.

After preliminary recitals, the judgment of Judge Armstrong continues and concludes as follows:

"'[A]nd the Court having reviewed the record of the State Board of Assessment, including the Stipulations of the parties, the testimony and other evidence, and having considered the Briefs submitted by the parties, and having heard oral arguments from the parties, and the Court being of the opinion [that

the property which is the subject of this proceeding was not 'situated' or 'more or less permanently located' in Forsyth County on January 1, 1972 and therefore did not have a tax situs in Forsyth County,] EXCEPTION NO. 2 and the Court being of the further opinion [that the evidence and the Stipulations of the parties do not support the conclusion of the State Board of Assessment that such property had a taxable situs in Forsyth County on January 1, 1972;] EXCEPTION NO. 3

"[NOW, THEREFORE, it is hereby ORDERED, ADJUDGED and DECREED that the property which is the subject of this proceeding did not have a tax situs in Forsyth County on January 1, 1972 and the Decision of the State Board of Assessment in this cause is hereby reversed. It is further ORDERED that the Tax Supervisor of Forsyth County shall strike the listings and assessments respecting the property which is the subject of this proceeding from the tax records of Forsyth County. It is further ORDERED that the costs of this action shall be taxed against Forsyth County.] EXCEPTION NO. 4."

Forsyth County's appeal challenges Judge Armstrong's legal conclusions and judgment.

*P. Eugene Price, Jr. for Forsyth County, appellant.*

*Hudson, Petree, Stockton, Stockton & Robinson by W. F. Maready; and John V. Hunter III for Hanes Dye and Finishing Company and 106 of its Customers, appellees.*

BOBBITT, Chief Justice.

We assume, without deciding, it was Hanes's legal duty under G.S. 105-315(a) to report the facts to the Forsyth County Tax Supervisor concerning the goods owned by its 106 customers but in its custody on 1 January 1972. By the terms of G.S. 105-315(b), any person who is required to file such a report but fails to do so becomes obligated for any unpaid portion of the tax assessed plus a penalty of $250.00. However, upon filing the report prescribed by G.S. 105-315(a), Hanes discharged its legal obligation. No statutory provision has been cited which purports to make Hanes liable for the taxes assessed on these goods or restrict in any way Hanes's right to dispose of these goods as directed by the owners thereof. However, Hanes would be affected substantially in these respects: (1) A tax required of a potential customer would adversely affect Hanes's position in a highly competitive field; and (2) both Hanes and its customers

---

---

would suffer inconveniences incident to obtaining accurate data as to the ownership of the goods on hand on January 1st and as to the precise condition of the goods of each customer as of that date.

We consider first whether North Carolina statutes authorize the taxation of goods which (1) are owned by nonresident converters, and (2) are shipped from outside North Carolina to Hanes for processing and reshipment to these converters or to their customers at designated places outside of North Carolina. Whether the goods of all the 102 nonresident converters are in this category will be discussed in the latter portion of this opinion.

Prior to 1972, there had been no taxation of goods of nonresidents in the custody of Hanes under substantially the same conditions on the particular day prescribed for the listing of tangible personal property for ad valorem taxes.

The State Board held that the goods owned by the 102 nonresident converters had a tax situs in Forsyth County on 1 January 1972.

G.S. 105-274(a), cited by the State Board, provides: "All property, real and personal, within the jurisdiction of the State shall be subject to taxation unless it is: [Defined exclusions and exemptions not pertinent to this appeal.]" We note that a provision to this effect has been a part of our statutory law at least since 1939. See Public Laws of 1939, Chapter 310, Section 303. In determining whether goods such as those now under consideration are to be taxed for the first time for 1972 taxes, decision depends upon interpretation of the portion of the 1971 Act now codified as G.S. 105-304. We note that the State Board based its decision on G.S. 105-304(d) (1) and (2).

G.S. 105-304, as now codified, was enacted in 1971. It is captioned, "Place for listing tangible personal property," and consists of subsections (a) through (h). Subsection (a) provides for the listing of all taxable tangible personal property that has a *tax situs* in this State, the place in this State in which such property is taxable to be determined according to the rules prescribed in subsections (c) through (h).

Subsection (b) provides:

"(b) Definitions.—For purposes of this section:

"(1) 'Situated' means more or less permanently located.

"(2) 'Business premises' includes, for purposes of illustration, but is not limited to the following: Store, mill, dockyard, piling ground, shop, office, mine, farm, factory, warehouse, rental real estate, place for the sale of property (including the premises of a consignee), and place for storage (including a public warehouse)."

Subsection (d) of G.S. 105-304 provides:

"(d) Property of Taxpayers With No Fixed Residence in This State.—

"(1) Tangible personal property owned by an individual nonresident of this State shall be taxable at the place in this State at which the property is situated.

"(2) Tangible personal property owned by a domestic or foreign taxpayer (other than an individual person) that has no principal office in this State shall be taxable at the place in this State at which the property is situated."

The State Board's decision rests primarily upon its finding and conclusion that the goods owned by the 102 out-of-State converters were in Hanes's possession on 1 January 1972 for "a very substantial business purpose—that of being dyed, finished or otherwise processed"; that these goods were in North Carolina for the length of time necessary for completion of this manufacturing process; and that the phrase, "more or less permanently located," used to define "situated" in G.S. 105-304(b) (1), does not apply to the facts in the present case.

It was stipulated that the work done in Hanes's plant for the out-of-State converters added a value to the cloth dyed or otherwise finished. Citing this fact, the brief for Forsyth County draws the conclusion that not only Hanes but the out-of-State converters were engaged in manufacturing in North Carolina at Hanes's plant. As support for this view, Forsyth County cites *Bleacheries Co. v. Johnson, Comr. of Revenue,* 266 N.C. 692, 147 S.E. 2d 177 (1966), and *Bedford Mills v. United States,* 59 F. 2d 263 (Court of Claims 1932).

In *Bleacheries Co.,* the plaintiff, a Rhode Island corporation, operated a textile finishing plant in North Carolina. Its business operations were closely analogous to those of Hanes. It was held that plaintiff's operations constituted manufacturing within the meaning of the statutes relating to its income and franchise taxes. Unquestionably, in respect of the goods it finished for

its customers on a contractual basis, Hanes was a manufacturer. Whether the out-of-State converters were manufacturers as contended by Forsyth County is an entirely different matter.

In *Bedford Mills,* the plaintiff, a New York corporation, was a converter. The controversy related to its liability in respect of federal income and excess profits taxes. The precise question was whether is inventories, consisting of goods in various stages of manufacture short of the final finished product, were to be valued in accordance with the regulations applicable to a trader as contended by Bedford Mills or under the regulations applicable to a manufacturer as contended by the Commissioner of Internal Revenue. Seemingly, *Bedford Mills* is authority only for the proposition that, for the purpose of computing federal taxes, these goods are to be inventoried as unfinished goods in process of manufacture rather than as completed products available for sale as merchandise. Obviously, the Commissioner of Internal Revenue was not concerned at all with the tax situs for ad valorem taxes of goods owned by Bedford Mills in the possession of a finishing mill.

[1] Although Hanes was engaged in manufacturing when processing the goods of its customers, Forsyth County's contentions (1) that the out-of-State converters were also engaged in manufacturing in North Carolina, and (2) that the "business premises" of Hanes were also the business premises of the out-of-State converters, are unrealistic and without merit. Hanes was not an agent of the out-of-State converters.

In *In re Publishing Co.,* 281 N.C. 210, 188 S.E. 2d 310 (1972), cited by Forsyth County, the question was whether all of the newsprint owned by the publishing company, a North Carolina corporation, and in its possession in Buncombe County on January 1st, was subject to ad valorem taxes. The publishing company had imported the newsprint. It contended it would take only six days to get an additional supply from its Canadian suppliers; and, therefore, an ad valorem tax on the portion of the newsprint in excess of a six-day supply would be a State tax on imports in violation of Article I, Section 10, of the United States Constitution. The Court held that all newsprint on hand on January 1st was subject to ad valorem taxes in Buncombe County, North Carolina, upholding the finding of the State Board of Assessment that the entire supply of newsprint on hand on January 1st constituted "current operational needs."

The opinion of Justice Branch in *In re Publishing Co., supra,* quotes the following from the opinion of Chief Justice Marshall in *Brown v. Maryland,* 25 U.S. (12 Wheat.) 419, 441-42, 6 L.Ed. 678, 686 (1827) : "It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the State. . . . " Chief Justice Marshall noted that the act of an importer who imports goods into this country for "his own use" and here uses them for the purpose for which they are imported indicates the article has lost its character as an import.

The factual situation now before the Court is quite different. Greige goods shipped into North Carolina for finishing by Hanes and then shipped out of North Carolina do not become incorporated and mixed up with the mass of property in North Carolina. None of it is owned by Hanes for any purpose. The identity of each specific lot and the owner thereof are carefully preserved at all times. Pursuant to a contractual arrangement in respect of each lot, it is more accurate to say that Hanes simply performs a service for which it receives a commission.

The State Board held that the term, "more or less permanently located," used to define "situated" in G.S. 105-304(b) (1), is applicable only when it becomes necessary to determine which of two or more locations has the greater degree of permanence with reference to the particular property under consideration. It asserts this term had its origin in *In re Freight Carriers,* 263 N.C. 345, 139 S.E. 2d 633 (1965), in which the question was whether certain motor vehicles owned by Pilot Freight Carriers were taxable in Forsyth County, where Pilot, a North Carolina corporation, had its principal place of business, or in Mecklenburg County, where Pilot maintained a terminal. It asserts the Court in that case expanded the definition of "situated" by saying that it did not mean "a mere temporary presence." Our research indicates that the term, "more or less permanently located," did not have its origin in *In re Freight Carriers, supra.* Nor does it appear that the generally accepted definition of this term was expanded therein.

The general use and significance of the term, "more or less permanently located," is set forth in 71 Am. Jur. 2d, State and Local Taxation §§ 660 and 661.

In re Appeal of Finishing Co.

§ 660 provides: "Before tangible personal property may be taxed in a state other than the domicil of the owner, it must have acquired a more or less permanent location in that state, and not merely a transient or temporary one. Generally, chattels merely temporarily or transiently within the limits of a state are not subject to its property taxes. Tangible personal property passing through or in the state for temporary purposes only, if it belongs to a nonresident, is not subject to taxation under a statute providing that all real and personal property in the state shall be assessed and taxed. . . . A criterion is whether the property is there for an indefinite time or some considerable definite time, and whether it is used or exists there to be used in much the same manner as other property is used in that community . . . . "

§ 661 provides: "Permanency in the sense of permanency of real estate is not essential to the establishment of a taxable situs for tangible personal property. It means a more or less permanent location for the time being. The ownership and uses for which the property is designed, and the circumstances of its being in the state, are so various that the question is often more a question of fact than of law. In the final analysis, the test perhaps is whether or not property is within the state solely for use and profit there. . . . "

Also, see Annotation, "Situs as between different states or countries of tangible chattels for purposes of property taxation," 110 A.L.R. 707, 717, 723 (1937), and supplemental decisions. At p. 717, the author states: "The courts are all agreed that before tangible personal property may be taxed in a state other than its owner's domicil, it must acquire there a location more or less permanent. It is difficult to define the idea of permanency that this rule connotes. It is clear that 'permanency,' as used in this connection, does not convey the idea of the characteristics of the permanency of real estate. It merely involves the concept of being associated with the general mass of property in the state, as contrasted with a transient status—viz., likelihood of being in one state today and in another tomorrow."

Although each involved a factual situation different from that now under consideration, we note that the term, "more or less permanently located," either verbatim or in essence, appears in *Mecklenburg County v. Sterchi Bros. Stores*, 210 N.C. 79, 83-84, 185 S.E. 454, 457 (1936); *Credit Corp. v. Walters*, 230 N.C. 443, 446, 53 S.E. 2d 520, 522 (1949); *Montague Brothers*

*v. Shepherd Co.*, 231 N.C. 551, 554, 58 S.E. 2d 118, 121 (1950). If it be considered that the meaning of the word "situated" as used in *In re Freight Carriers, supra,* to wit, "Clearly, *situated* connotes a more or less permanent location," was expanded by the next sentence, to wit, "It does not mean a mere temporary presence," the definition of "situated" in subsection (b) of G.S. 105-304 was incorporated in our statutory law by Chapter 806, Session Laws of 1971, presumably with full knowledge of what the State Board called the expanded meaning of the term.

In *Transfer Corp. v. County of Davidson*, 276 N.C. 19, 170 S.E. 2d 873 (1969), the plaintiff, a North Carolina corporation having its principal office and place of business in Davidson County, was a common carrier of freight. It contended Davidson County was entitled to assess ad valorem taxes only on the proportion of the value of the vehicles engaged in interstate commerce which the number of miles traveled in this State bore to the total miles traveled by these vehicles. The plaintiff failed to show either that its vehicles were operated along fixed routes and on regular schedules into, through, and out of the nondomiciliary states, or that its vehicles were habitually situated and employed in other states throughout the year. The Court held the entire value of these vehicles was subject to taxation by Davidson County. The decisions cited relate to analogous properties, *e.g.,* ships, railroad cars and aircraft. The analyses of these decisions by Justice Huskins in his opinion for this Court disclosed that to acquire a tax situs in a nondomiciliary state it must be shown that the property had a permanent situs or be habitually employed therein. Also, see *In re Trucking Co.,* 281 N.C. 375, 393, 189 S.E. 2d 194, 206 (1972).

The State Board was of the opinion that any determination of the tax situs of tangible personal property must take into account the nature of the property involved. We agree.

Each of the decisions cited by Forsyth County and by Hanes has been considered. Suffice to say, none is deemed authoritative or persuasive with reference to the present factual situation. Most involve factual situations in which *the same property, e.g.,* motor vehicles, passed back and forth between states. Others involve property, *e.g.,* road machinery, used in a nondomiciliary state in the prosecution of the owner's business.

We are considering now the goods of nonresident converters shipped from outside of North Carolina to Hanes for processing

and reshipment to these converters or to their customers at designated places outside of North Carolina. Presumably, the greige goods shipped to Hanes for finishing had been in existence as greige goods a comparatively short time before being shipped to Hanes. Whether they had been taxed as greige goods during 1971 in the state where they were manufactured does not appear. The present case involves 1972 taxes. The goods in possession of Hanes on January 1st, whether still greige goods or partially or completely finished, were in its possession for a single purpose and for a fixed and limited time. Their temporary presence in North Carolina was for the sole purpose of enabling Hanes in the prosecution *of its business* to perform a service. After this service had been completed, the goods were shipped as directed by the converters, ordinarily to the new owners thereof, such as manufacturers of automobiles and of clothing, who would incorporate them in their completed manufactured articles. To what extent, if any, these same goods, in the same form or after being incorporated into the final product of the new owner, were subject to 1972 ad valorem taxes in the state of the new owner does not appear. We note that the dates for listing tangible personal property for ad valorem taxation differ from state to state. The question here is not whether the greige goods in the possession of Hanes on January 1st were subject to taxation on that date in the states where the owners thereof on that date resided. The sole question is whether the goods had a tax situs in Forsyth County on January 1st.

Ultimate decision depends upon whether the stipulated facts establish that these goods of nonresident owners were more or less *permanently* located in Forsyth County on January 1st. Obviously, the words *more or less* permanently exclude the necessity of establishing unqualified permanency such as actual and continuous presence in the State. On the other hand, any degree of permanency would seem to require more than a temporary presence of limited duration within the State for a specific service pursuant to a scheduled arrangement as to time of entrance and departure.

[2]   We hold these goods were not "situated" or "more or less permanently located" in Forsyth County on 1 January 1972, and therefore did not have a tax situs in Forsyth County on that date. Hence, with reference to *these goods,* our decision is in accord with that of Judge Armstrong.

Attention is directed to the following portions of the stipulations:

Paragraph 4 in part states: "[T]he converter then buys cloth known as 'greige goods' from a greige mill. Most of such mills are located in the Southern States. During 1971, approximately 10% of the greige goods shipped to Hanes came from greige mills in North Carolina. This percentage is closely representative of the past 3 or 4 years."

Paragraph 12 in part states: "During 1971, approximately 95.4% of all work done by Hanes was for customers having their principal office and place of business outside the State of North Carolina. The remaining 4.6% of the work was done for corporations having their principal office and place of business in North Carolina. The [4] North Carolina corporations and their principal office and place of business were as follows: [Names and addresses omitted.] Approximately 95% of the goods shipped from Hanes during 1971 were shipped out of the State of North Carolina."

[3]  Whether all of the four North Carolina corporations are converters rather than manufacturers of greige goods is unclear. Certainly, greige goods manufactured in North Carolina, shipped to Hanes for processing, and owned by a North Carolina corporation when in Hanes's custody on January 1st, are subject to ad valorem taxes in North Carolina. The same is true in respect of goods owned by a North Carolina corporation but in Hanes's possession on January 1st without regard to whether the North Carolina corporation purchased the goods from a greige mill in North Carolina or from a greige mill outside the State and had them shipped to Hanes for processing. In respect of a North Carolina corporation, its tangible personal property located in North Carolina on January 1st is subject to ad valorem taxation without reference to whether it is in the custody of Hanes or in the actual custody of the North Carolina corporation. Whether such property is taxable in the county where the principal office and place of business is located or the county where the property is physically situated is a matter for determination by the State Board of Assessment. *In re Freight Carriers, supra.*

[4]  The quoted portions of the stipulations give rise to uncertainty as to what goods, if any, owned by nonresident converters but in Hanes's possession on January 1st had been purchased from North Carolina greige mills and shipped to Hanes for processing and reshipment to the converter or its cus-

---

In re Appeal of Finishing Co.

---

tomer at a destination outside of North Carolina. In our view, the goods, if any, in this category, are subject to ad valorem taxation by Forsyth County. In a decision cited by Forsyth County, to wit, *Standard Oil Company v. Combs,* 96 Ind. 179, 49 Am. Rep. 156 (1884), the holding is accurately and succinctly stated in the headnote (Am. Rep.) as follows: "Chattels purchased in one state by a citizen of another, and remaining in the former to receive a finishing process of manufacture, are taxable in the state where purchased."

The quoted portions of the stipulations also give rise to uncertainty as to what portion, if any, of the goods owned by nonresident converters but in Hanes's possession on January 1st had been purchased from greige mills outside of North Carolina and shipped to Hanes for processing and for reshipment by Hanes in accordance with the nonresident converters' instructions to customers in North Carolina. We are inclined to the view that goods in this category, if any, would be subject to taxation by Forsyth County. However, absent a clarification of of the facts relating to such a situation, we make no definitive ruling.

In view of his adjudication that none of the goods of the 106 customers were subject to ad valorem taxes, Judge Armstrong made no decision with reference to the basis on which the goods, if subject to ad valorem taxes, should be appraised. This question will be for consideration by the superior court if and when it is determined that any of these goods were subject to ad valorem taxes.

The foregoing leads to these conclusions: With reference to goods of nonresident converters shipped from outside of North Carolina to Hanes for processing and reshipment to these converters or to their customers at designated places outside of North Carolina, the judgment of Judge Armstrong is affirmed. With reference to goods, if any, in the other categories discussed above, the cause is remanded for clarification of the facts and for further consideration in a manner not inconsistent with this opinion.

Affirmed in part, modified and remanded.

Justice HIGGINS, dissenting from that part of the opinion which modifies and remands the proceeding for further consideration.

In my opinion the subject property was never more or less permanently situated in North Carolina and, therefore, did not acquire a tax status in this State. The stipulated facts fail to bring the subject property into the ambit of North Carolina taxing statutes and Judge Armstrong's judgment dismissing the action should be affirmed.